Argued and submitted April 9, 2010; resubmitted en banc June 5, reversed and
remanded June 19, 2013, petition for review allowed January 16, 2014
(354 Or 699)

Marilyn C. PEARSON
and Laura Grandin,
individually and on behalf of
all similarly situated persons,
*Plaintiffs-Appellants,*

*v.*

PHILIP MORRIS, INC.,
aka Philip Morris USA, Inc.,
a foreign corporation,
*Defendant-Respondent,*

*and*

PHILIP MORRIS COMPANIES, INC.,
aka Altria Group, Inc.,
a foreign corporation,
*Defendant.*

Multnomah County Circuit Court
021111819; A137297

306 P3d 665

Scott A. Shorr argued the cause for appellants. With him on the briefs were Stoll Stoll Berne Lokting & Schlachter P.C., and Charles S. Tauman and Charles S. Tauman PC.

William F. Gary argued the cause for respondent. With him on the brief were Sharon A. Rudnick and Harrang Long Gary Rudnick P.C.

Before Haselton, Chief Judge, and Armstrong, Wollheim, Schuman, Ortega, Sercombe, Duncan, Nakamoto, Hadlock, and Egan, Judges.

ARMSTRONG, J.

Duncan, J., concurring in part and dissenting in part.

## ARMSTRONG, J.

Plaintiffs, who purchased Marlboro Lights cigarettes manufactured by defendant,[1] brought this action against defendant under the Oregon Unlawful Trade Practices Act (UTPA), ORS 646.605 to 646.652. Plaintiffs alleged that defendant had violated the UTPA by misrepresenting the characteristics of Marlboro Lights and that, as a result of defendant's misrepresentations, they had suffered economic losses.

Plaintiffs filed a motion asking the trial court to certify the action as a class action, with a class consisting of the approximately 100,000 people who had purchased Marlboro Lights in Oregon from the time in 1971 that Marlboro Lights were introduced until 2001. As an alternative to class certification of the entire action, plaintiffs asked the trial court to certify a class to litigate common issues in the case.

In order for an action to be certified as a class action, the class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." ORCP 32 B. One factor courts are to consider when determining whether a class action would be superior to other available methods to adjudicate a controversy is "the extent to which questions of law or fact common to the members of the class predominate over any questions affecting only individual members." ORCP 32 B(3).

The trial court denied plaintiffs' motion for class certification and their alternative motion for certification of an issue class. The court did so because it concluded that whether plaintiffs and the other putative class members had suffered ascertainable losses and, if so, whether those losses had resulted from defendant's representations were questions that could not be resolved based on evidence common to the class and, therefore, common questions did not predominate over individual ones and a class action would not be superior to individual trials.

---

[1] By "defendant" we refer to defendant Philip Morris, Inc., aka Philip Morris USA, Inc.; defendant Philip Morris Companies, Inc., aka Altria Group, Inc., is not a party to this appeal.

After the trial court denied plaintiffs' certification motions, defendant moved for summary judgment on plaintiffs' individual claims, asserting, among other things, that they were preempted by federal law. The trial court agreed that the claims were preempted by federal law, granted summary judgment for defendant, and entered a judgment dismissing plaintiffs' claims.

On appeal, we conclude that the trial court erred in granting defendant's motion for summary judgment on plaintiffs' individual claims and in denying plaintiffs' motion for class certification. We also conclude that the trial court's denial of plaintiffs' alternative motion for certification of an issue class was based on the erroneous conclusion that litigation of each of the three elements of plaintiffs' claims—an unlawful trade practice, causation, and damages—would involve individual inquiries of all the putative class members. Therefore, we reverse and remand.

## I. STANDARDS OF REVIEW

Whether a claim is preempted by federal law presents a legal question, which we review for legal error. *See Willis v. Winters*, 350 Or 299, 309, 253 P3d 1058 (2011) (applying standard). Whether, for purposes of class certification, a question is a common or individual one and whether common questions predominate are legal questions, which we decide anew, based on the record before the trial court and the trial court's findings, if any. *Bernard v. First Nat'l Bank*, 275 Or 145, 154, 550 P2d 1203 (1976). Whether a class action would be superior to other methods of adjudication is a matter of judicial administration, which we review for abuse of discretion. *Newman v. Tualatin Development Co., Inc.*, 287 Or 47, 51, 597 P2d 800 (1979); *Joachim v. Crater Lake Lodge, Inc.*, 48 Or App 379, 393, 617 P2d 632, *rev den*, 290 Or 211 (1980).

## II. HISTORICAL AND PROCEDURAL FACTS

We begin with a description of the historical facts that gave rise to this action. We base our factual description on the trial court's letter opinion and the undisputed evidence

in the record.[2] We then recount the procedural facts, describing plaintiffs' claims for relief, the parties' arguments and evidence on class certification, and the trial court's decision. We describe additional evidence later in our opinion as it becomes relevant to our analysis.

## A. *Factual Background*

Scientific studies were published in the 1950s suggesting a link between cigarette smoking and lung cancer. More specifically, the studies suggested a link between tar and nicotine from cigarette smoke and lung cancer. Nicotine is an organic compound found in the leaves of tobacco plants. It is a stimulant and has addictive properties. Cigarette smokers ingest nicotine when they draw cigarette smoke into their mouths and lungs. Along with nicotine, they ingest tar, which is the collection of substances produced when tobacco is burned, apart from water, gases, and nicotine. A smoker's tar intake is closely correlated to the smoker's nicotine intake.

The studies linking tar and nicotine to lung cancer created consumer demand for cigarettes that would deliver less tar and nicotine. In response, cigarette manufacturers introduced filtered cigarettes. The manufacturers marketed filtered cigarettes as safer than unfiltered cigarettes, and the market share of filtered cigarettes rapidly increased.

In a related effort to appeal to smokers who were concerned about the health risks of smoking, cigarette manufacturers began to advertise the tar and nicotine yields of their cigarettes. However, there was no uniform method to measure those yields; each manufacturer employed its own method, which led to consumer confusion. In response, in 1959, the Federal Trade Commission (FTC) told manufacturers that it would construe representations about tar and nicotine yields to be implied health claims that were unsubstantiated, and manufacturers stopped making the representations.

---

[2] The primary issue in this case is whether the trial court erred in denying plaintiffs' motion for class certification. As the trial court noted, any findings made by a trial court at the class-certification stage are made only for purposes of the court's certification decision.

In 1964, the Surgeon General issued the first Surgeon General's report on cigarette smoking and health, which significantly increased public awareness of the health risks of smoking. Around the same time, public health organizations, acting in response to scientific studies linking tar and nicotine to health risks, advocated for the reduction of tar and nicotine in cigarette smoke. For example, in 1966, at the invitation of the Surgeon General, a group of leading scientists met to review the "state of medical knowledge on the significance of the tar and nicotine contents of cigarettes" and unanimously adopted the following resolutions:

> "(1)   The preponderance of scientific evidence strongly suggests that the lower the 'tar' and nicotine content of cigarette smoke, the less harmful are the effects.

> "(2)   We recommend to the Surgeon General that actions be encouraged which will result in the progressive reduction of the 'tar' and nicotine content of cigarette smoke."

112 Cong Rec 17,270 (1966) (statement of Sen Warren Magnuson). The following year, the FTC changed course and allowed cigarette manufacturers to make representations about tar and nicotine yields, provided that the representations were substantiated by results from a standardized test, which came to be known as the "FTC Method." To be described as "low tar," a cigarette had to have a tar yield of 15 milligrams or less as measured by the FTC Method.

The FTC Method of testing involves the use of a cigarette-smoking machine, and it is governed by FTC regulations that specify the depth to which the cigarette is inserted into the machine, the volume of air drawn through the cigarette with each puff, the number of puffs drawn per minute, and the amount of the cigarette that is burned.

In the late 1960s and early 1970s, cigarette manufacturers tested different ways to reduce smokers' tar and nicotine intake, including "'puffing' the tobacco to reduce the weight of tobacco in a cigarette, altering the blends of tobacco used and porosity of the paper wrapper, changing the density of the tobacco rod, using tobacco stems

and reconstituted tobacco sheet, and using a wide variety of filter materials." US Department of Health & Human Services, National Institutes of Health, National Cancer Center, *Risks Associated with Smoking Cigarettes with Low Machine-Measured Yields of Tar and Nicotine*, 69 (Oct 2001) (Monograph 13). At the same time, however, the manufacturers considered the possibility that developing cigarettes that would deliver less tar and nicotine could have adverse effects on their sales. For example, in a 1966 market analysis, defendant recognized the relationship between nicotine delivery and cigarette sales, stating:

> "[A]ny health cigarette must compromise between health implications on the one hand and flavor and nicotine on the other * * * flavor and nicotine are both necessary to sell a cigarette. A cigarette that does not deliver nicotine cannot satisfy the habituated smoker and cannot lead to habituation, and would therefore almost certainly fail."

Monograph 13 at 206 (quoting M. E. Johnston, *Market Potential of a Health Cigarette, Special Report No. 248, Philip Morris*, 5 (June 1966)) (alterations in Monograph 13).[3] In the same report, defendant recognized that, although a large proportion of smokers were concerned about the health

---

[3] Similarly, in a 1969 internal document, cigarette manufacturer R. J. Reynolds expressed concern that introducing cigarettes that would deliver less nicotine (and tar) would be "self-defeating" for the tobacco industry because it might make it easier for smokers to stop smoking:

> "In its search for 'safer' cigarettes, the tobacco industry has, in essentially every case, simply reduced the amount of nicotine * * * perhaps weaning the smoker away from nicotine habituation and depriving him of parts of the gratification desired or expected. * * * Thus, unless some miraculous solution to the smoking-health problem is found, the present 'safer' cigarette strategy, while prudent and fruitful for the short term, may be equivalent to long term liquidation of the cigarette industry."

Monograph 13 at 207 (quoting C. E. Teague, *Proposal of a New, Consumer-Oriented Business Strategy for RJR Tobacco Company*, 9-10 (Sept 19, 1969)) (alterations in Monograph 13). Concern about the risks of "weaning" smokers from cigarettes was also expressed in a 1976 internal document of the British American Tobacco Company, which stated:

> "Taking a long-term view, there is a danger in the current trend of lower and lower cigarette deliveries—*i.e.*, the smoker will be weaned away from the habit. * * * Nicotine is an important aspect of 'satisfaction,' and if the nicotine delivery is reduced below a threshold 'satisfaction' level, then surely smokers will question more readily why they are indulging in an expensive habit."

British American Tobacco Co., Ltd., *The Product in the Early 1980s*, 2 (Mar 29, 1976).

risks of smoking, their concerns could be assuaged by ciga-
rette filters that appeared to be more effective, but were not
actually more effective. The report stated:

"1.   A large proportion of smokers are concerned about
the relationship of cigarette smoking to health * * *.

"* * * * *

"9.   Mere reduction in nicotine and TPM [(total par-
ticulate matter)] deliveries by conventional methods of fil-
tration would not be a sufficient basis for launching a new
cigarette.

"10.   The illusion of filtration is as important as the fact
of filtration.

"11.   Therefore any entry should be by a radically dif-
ferent method of filtration, but need not be any more effec-
tive."

*Id.* (quoting M. E. Johnston, *Market Potential of a Health
Cigarette, Special Report No. 248, Philip Morris*, 1-2 (June
1966)) (alterations in Monograph 13).

Thereafter, defendant and other cigarette manu-
facturers recognized the value of designing cigarettes with
"elasticity of delivery" so that smokers could obtain more
tar and nicotine than measured by the FTC Method. As one
manufacturer stated, "[w]hat would seem very much more
sensible, is to produce a cigarette which can be machine
smoked at a certain tar band, but which, in human hands,
can exceed this tar banding[.]" Monograph 13 at 70 (quoting
C. C. Grieg, Structured Creativity Group, British American
Tobacco Company R&D, Southampton, *Marketing Scenario*).

In 1971, defendant introduced Marlboro Lights.
At that time, Marlboro Lights yielded 13 milligrams of
tar according to the FTC Method, and regular Marlboro
cigarettes yielded 18 milligrams.[4] (At the time of the
trial court's decision in this case, Marlboro Lights yielded
11 milligrams of tar, and Marlboro Regulars yielded
16 milligrams.) Packages of Marlboro Lights bore the name
"Lights" and the description "Lowered Tar & Nicotine."
Defendant has always sold Marlboro Lights for the same
price as Marlboro Regulars.

---

[4] All references to measured tar and nicotine yields are per the FTC Method.

If a person smokes a cigarette differently from the manner in which the FTC machine smokes a cigarette, the person may receive amounts of tar and nicotine that differ from those measured by the machine. For example, Marlboro Lights yield less measured tar and nicotine than Marlboro Regulars due primarily to the effect of small holes in the Marlboro Lights filters. The holes allow air to be drawn in, diluting the smoke from the cigarette. A person, unlike the FTC machine, may cover up those holes, which are located where smokers commonly put their fingers and lips while holding cigarettes. Another way to receive more than the measured amount of tar and nicotine is by ingesting more smoke than the FTC machine does—for example, by taking longer or more frequent puffs on the cigarette or smoking more of the cigarette.

As mentioned, nicotine is a stimulant; it causes physical effects—such as increased energy or alertness—that many cigarette smokers regard as desirable and come to associate with the act of smoking and the taste of cigarette smoke. Nicotine is also addictive, and a person may obtain more nicotine by ingesting more cigarette smoke. Thus, when a person has a greater desire for the effects of nicotine, the person may, consciously or unconsciously, alter his or her smoking method in order to receive a greater amount of nicotine. As a result, the amount of nicotine that a person ingests can vary, even from cigarette to cigarette. The act of altering one's smoking method in order to affect the nicotine yield of an individual cigarette is called "titration."

Similarly, if a smoker who is accustomed to a higher-yield cigarette switches to a lower-yield cigarette, the smoker may alter his or her smoking method in order to obtain the amount of nicotine to which he or she is accustomed. That alteration is called "compensation." As the trial court observed, "[w]riters and speakers do not always distinguish between 'compensation,' which by definition involves a change from one type of cigarette to another, [and] 'titration,' which may be done by someone who has only ever smoked one brand of cigarette." A smoker who switches from a higher-yield cigarette to lower-yield cigarette may compensate by altering his or her smoking method, smoking more cigarettes, or both.

Cigarette manufacturers, including defendant, have long been aware that smokers engaged in titration and compensation behaviors. They were also aware that, because of those behaviors and the elasticity of delivery of cigarettes with dilution filters like those on Marlboro Lights, the tar and nicotine yields for human smokers could be higher than those measured by the FTC Method. For example, a 1978 Philip Morris report summarizing a meeting with Dr. W. J. Hunter states:

> "I told him we do not make judgments on the relevance of tar to health.
>
> I did, however, point out that measurement of tar yields, or indeed any smoke yields, under laboratory conditions bore no direct relationship to any individual[']s exposure to any substance."

M. E. Mulholland, Philip Morris, *Report of Meeting with Dr. W. J. Hunter*, 2 (Sept 1978).

Although defendant's representations that Marlboro Lights were "Lights" and had "Lowered Tar & Nicotine" were based on FTC test results, Marlboro Lights packages did not refer to the FTC test or provide the numerical results of the test. But, since 1970, defendant's advertising has included numerical results. In 1990, defendant added the following statement to its advertising: "The amount of tar and nicotine you inhale will vary depending on how you smoke the cigarette."

After plaintiffs and others across the country filed actions against defendant based on its representations about Marlboro Lights, defendant stopped using the description "Lowered Tar & Nicotine" on Marlboro Lights packages. For a short period of time, defendant also began to include periodic "onserts" in Marlboro Lights packages.[5] The onserts included statements such as:

> "The tar and nicotine yield numbers are not meant to communicate the amount of tar or nicotine actually inhaled by any smoker, as individuals do not smoke like the machine used in the government test method. The amount of tar and

---

[5] Similar to an insert, an "onsert" is a piece of advertising that is affixed to another product or otherwise featured in consumer packaging.

nicotine you inhale will be higher than the stated tar and nicotine yield numbers if, for example, you block ventilation holes, inhale more deeply, take more puffs or smoke more cigarettes. Similarly, if you smoke brands with descriptions such as 'Ultra Light,' 'Light,' 'Medium' or 'Mild,' you may not inhale less tar and nicotine than you would from other brands. It depends on how you smoke.

"You should not assume that cigarette brands using descriptions like 'Ultra Light,' 'Light,' 'Medium,' or 'Mild,' are less harmful than 'full flavor' cigarette brands or that smoking such cigarette brands will help you quit smoking."

The onserts were not included in all Marlboro Lights packages. According to defendant, that was not necessary because "people don't just buy one pack of cigarettes. They choose the brand and they continue to smoke that brand." A study by defendant states that 86 percent of people who were smoking Marlboro Lights saw the onserts.

## B. *Procedural Facts*

### 1. *Plaintiffs' Claims and Defendant's Answer*

Plaintiffs brought this action against defendant under the UTPA, which provides, in part:

"A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person * * * [r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have * * *."

ORS 646.608(1)(e). A "representation" "may be any manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS 646.608(2). Thus, a person who, in the course of the person's business, makes a false assertion about the characteristics of goods—either by misstating a fact or by failing to disclose a fact—commits an unlawful trade practice under ORS 646.608(1)(e).

The UTPA's prohibitions can be enforced through actions brought by the government, as well as actions brought by private plaintiffs. The government may investigate and bring actions to enjoin and penalize UTPA violations, and

it is not required to prove that the UTPA violations caused any harm. *See, e.g.*, ORS 646.618 (authorizing investigations); ORS 646.632 (authorizing pursuit of injunctions); ORS 646.642 (authorizing enforcement of injunctions and compliance agreements and civil penalties). Private plaintiffs may bring UTPA actions pursuant to ORS 646.638(1), which provides, in part:

> "[A]ny person who *suffers any ascertainable loss* of money or property, real or personal, *as a result of* willful use or employment by another person of *a method, act or practice declared unlawful by ORS 646.608*, may bring an individual action in an appropriate court to recover actual damages or statutory damages of $200, whichever is greater. The court or the jury, as the case may be, may award punitive damages and the court may provide the equitable relief the court considers necessary or proper."

(Emphasis added.) Thus, in order for a plaintiff to prevail in an action for damages brought pursuant to ORS 646.638(1), the plaintiff must establish that he or she suffered an ascertainable loss as a result of an unlawful trade practice by the defendant. In other words, the plaintiff must prove an unlawful trade practice, causation, and damages. *Feitler v. The Animation Celection, Inc.*, 170 Or App 702, 708, 13 P3d 1044 (2000).

Plaintiffs brought this action pursuant to ORS 646.638, seeking damages and equitable relief. In their complaint, plaintiffs alleged that defendant had violated the UTPA by making false representations about the characteristics of its Marlboro Lights cigarettes.[6] Specifically, plaintiffs alleged that, by naming the cigarettes "Lights" and by describing them on their packages as having "Lowered Tar & Nicotine," defendant had committed an unlawful trade practice, as defined by ORS 646.608(1)(e), because it had represented Marlboro Lights to have "characteristics that they did not and do not have."

Plaintiffs alleged that defendant had designed Marlboro Lights cigarettes to yield a certain amount of tar

---

[6] All references to plaintiffs' complaint are to their operative complaint, the Fourth Amended Complaint.

and nicotine as measured by the FTC Method and had used those results to convey to consumers that Marlboro Lights would deliver less tar and nicotine than Marlboro Regulars, even though defendant knew that, as a result of the way that consumers smoked them, Marlboro Lights could deliver the same amount of tar and nicotine as Marlboro Regulars. According to plaintiffs, defendant's design and marketing efforts were intended "to preserve market share by filling a perceived demand for a cigarette which was less dangerous than regular cigarettes as an alternative to quitting smoking."

Plaintiffs further alleged that defendant knew that consumers were "buying and smoking Marlboro Lights under the false impression that [Marlboro Lights] delivered less tar and nicotine than regular cigarettes" and that defendant "encourage[d] that false impression despite [its] superior knowledge about the way consumers smoked Marlboro Light[s]."

Plaintiffs asserted two separate and distinct claims for relief. Because the specific allegations in the claims affect the facts plaintiffs would have to prove to prevail on their claims, we set out the claims in full. In their first claim, plaintiffs alleged:

"Defendant engaged in an unlawful trade practice within the meaning of ORS 646.608(1)(e) by representing that its cigarettes had characteristics that they did not and do not have, that is, *that those cigarettes would deliver to plaintiff[s] and other Marlboro Light smokers less tar and nicotine than defendant's regular 'Marlboro Red' cigarettes.* In fact, as defendant well knew, *plaintiff[s] and other class members would actually receive the same tar and nicotine from defendant's Marlboro Light cigarettes as from defendant's Marlboro Red cigarettes.*

"As a direct result of defendant's conduct in willful violation of ORS 646.608(1), plaintiffs and class members suffered ascertainable losses because *they paid for 'lowered tar and nicotine' cigarettes that in fact did not deliver lowered tar and nicotine to the smoker than did regular cigarettes.*"

(Emphasis added.)

In their second claim, plaintiffs alleged:

"Defendant engaged in an unlawful trade practice within the meaning of ORS 646.608(1)(e) by representing that its cigarettes had characteristics that they did not and do not have, that is, that *defendant's 'light' cigarettes were inherently lower in tar and nicotine than defendant's regular cigarettes, no matter how they were smoked.* In fact, as defendant well knew, whether a smoker actually received lower tar and nicotine depended on several factors, such as whether the smoker covered ventilation holes in the cigarette, the number of puffs taken on each cigarette, and the amount of each cigarette smoked, none of which defendant disclosed to any plaintiff or class member. Defendant *both affirmatively misrepresented* that its 'light' cigarettes would inherently deliver low tar and nicotine, *and failed to disclose* that, in order to receive low tar and nicotine, the smoker would have to smoke the 'light' cigarettes in a particular way. This failure to disclose was a misrepresentation within the meaning of ORS 646.608(2).

"As a direct result of defendants' conduct described in [the preceding paragraph], plaintiffs and class members suffered ascertainable losses because *they paid for cigarettes they believed were inherently lower in tar and nicotine than defendants' regular cigarettes but received cigarettes that would deliver lowered tar and nicotine only if smoked in particular ways* as described in [the preceding paragraph]."

(Emphasis added.) Thus, in their second claim for relief, plaintiffs alleged that defendant represented that Marlboro Lights "*were inherently lower in tar and nicotine* than defendant's regular cigarettes, no matter how they were smoked" and that, as a direct result of that representation, "plaintiffs and class members suffered ascertainable losses because they paid for cigarettes they believed were inherently lower in tar and nicotine than defendant's regular cigarettes but received cigarettes that *would deliver lowered tar and nicotine only if smoked in particular ways*[.]" (Emphasis added.)[7]

---

[7] Significantly, as the trial court observed, plaintiffs' claims are based on "the alleged falsity of the implied comparison of Marlboro Lights to Marlboro [Regulars]." Plaintiffs made no claims "based on the publication (in ads) of the specific amounts of tar and nicotine yielded by Marlboro Lights as measured by the FTC Method."

Plaintiffs' two claims allege different losses. In their first claim, plaintiffs allege that the Marlboro Lights that they purchased did not actually deliver less tar and nicotine to them, and in their second, they allege that the Marlboro Lights were not actually inherently light. The claims differ in that the first claim depends on how the Marlboro Lights were smoked, but the second does not. Because, as noted below, 257 Or App at 127, plaintiffs' arguments to the trial court and to this court are based solely on their second claim, we do not discuss the first claim further.

Plaintiffs sought an order under ORCP 32 A and ORCP 32 B, set out below, 257 Or App at 121, 121-22 n 9, "certifying a class action of all purchasers who bought Marlboro Lights in Oregon." Plaintiffs estimated that the class had more than 100,000 members.[8] As an alternative, plaintiffs sought an order under ORCP 32 G "certifying an issue class of all purchasers of Marlboro Lights in Oregon as to common issues identified in the class certification briefing and argument."

On behalf of themselves and the putative class members, plaintiffs sought "[e]conomic damages for purchase price refund or diminished value" and noted their intent to amend the complaint to seek punitive damages. They also sought "[e]quitable relief in the form of rescission, restitution, and disgorgement of profits" and "attorney fees and costs under the UTPA."

In its answer, defendant denied plaintiffs' allegations and raised 21 affirmative defenses. Defendant asserted that plaintiffs' claims were barred by, among other things, the statute of limitation and state and federal constitutional provisions and also because defendant had complied with FTC regulations. Defendant further asserted that it was not liable to plaintiffs or the putative class members because, in its words, "all information allegedly not disclosed was in the public domain" and because "plaintiffs and the putative class members had the means of knowing, by the exercise of

___

[8] Because this is a UTPA action, plaintiffs' proposed class consists of Marlboro Lights *purchasers*. Therefore, as the trial court observed, the "purchasers need not have smoked any of the cigarettes they purchased. Conversely, people who smoke[d] Marlboro Lights that were purchased by others would not be members of the class."

ordinary intelligence, the truth or real quality of the alleged statements concerning smoking and health."

## 2. *Parties' Arguments Regarding Class Certification*

ORCP 32 governs class actions. ORCP 32 A identifies five requirements for class actions. It provides:

"One or more members of a class may sue or be sued as representative parties on behalf of all only if:

"A(1)   The class is so numerous that joinder of all members is impracticable;

"A(2)   There are questions of law or fact common to the class;

"A(3)   The claims or defenses of the representative parties are typical of the claims or defenses of the class;

"A(4)   The representative parties will fairly and adequately protect the interests of the class; and

"A(5)   In an action for damages, the representative parties have complied with the prelitigation notice provisions of section H of this rule."

ORCP 32 B identifies a sixth requirement for class actions. It provides that an action can proceed as a class action if the five requirements set out in ORCP 32 A are met and if "the court finds that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." ORCP 32 B also identifies eight "matters pertinent" to whether a class action is superior to other methods for adjudicating the controversy.[9] One of those

---

[9] ORCP 32 B provides:

"An action may be maintained as a class action if the prerequisites of section A of this rule are satisfied, and in addition, the court finds that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to this finding include:

"B(1)   The extent to which the prosecution of separate actions by or against individual members of the class creates a risk of:

"B(1)(a)   Inconsistent or varying adjudications with respect to members of the class which would establish incompatible standards of conduct for the party opposing the class; or

"B(1)(b)   Adjudications with respect to members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests;

matters is "the extent to which questions of law or fact common to the members of the class predominate over any questions affecting only individual members[.]" ORCP 32 B(3). Although, under the earlier class-action statute and an earlier version of ORCP 32, a court could not certify an action such as this one as a class action unless common questions predominated over individual ones, "[i]n 1992, the Council on Court Procedures amended the rule to remove the absolute requirement." *Shea v. Chicago Pneumatic Tool Co.*, 164 Or App 198, 207, 990 P2d 912 (1999), *rev den*, 330 Or 252 (2000). Thus, ORCP 32 B "does not *require* predominance as a *sine qua non* of certification of any class." *Id.* (emphasis in original).

In the trial court, the parties disputed whether the requirements for class certification were satisfied. Each party submitted a written memorandum in support of its arguments, along with hundreds of pages of exhibits. The exhibits include scientific articles, summaries of consumer surveys, and depositions of experts.

### a. *Defendant's Arguments on Class Certification*

Defendant opposed plaintiffs' motion for class certification, arguing, among other things, that a class action would not be "superior to other available methods for the fair

---

"B(2)   The extent to which the relief sought would take the form of injunctive relief or corresponding declaratory relief with respect to the class as a whole;

"B(3)   The extent to which questions of law or fact common to the members of the class predominate over any questions affecting only individual members;

"B(4)   The interest of members of the class in individually controlling the prosecution or defense of separate actions;

"B(5)   The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

"B(6)   The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

"B(7)   The difficulties likely to be encountered in the management of a class action that will be eliminated or significantly reduced if the controversy is adjudicated by other available means; and

"B(8)   Whether or not the claims of individual class members are insufficient in the amounts or interests involved, in view of the complexities of the issues and the expenses of the litigation, to afford significant relief to the members of the class."

and efficient adjudication of the controversy," ORCP 32 B, because "questions * * * common to the members of the class" would not predominate over "questions affecting only individuals," ORCP 32 B(3). Defendant asserted that the case presented several important questions that could not be resolved based on evidence common to the class because, with respect to those questions, the putative class members were not similar enough to be treated as a group. In other words, with respect to those questions, the class was not sufficiently cohesive. Defendant's primary arguments related to two of the elements of plaintiffs' UTPA claims: damages and causation.

Regarding damages, defendant argued that, in order for plaintiffs to prove that they had suffered "ascertainable losses," as required by ORS 646.638(1), plaintiffs would have to prove that the Marlboro Lights that they and putative class members purchased did not actually deliver less tar and nicotine than Marlboro Regulars, and plaintiffs could not do that on a class-wide basis because a smoker's tar and nicotine intake depends on the smoker's individual behavior. According to defendant, plaintiffs' claims were premised on the notion that people who smoke Marlboro Lights do so in a way that enables them to obtain the same amount of nicotine that they would from smoking Marlboro Regulars or other regular cigarettes. That premise is flawed, defendant argued, because not all Marlboro Lights smokers try to increase their nicotine intake. Further, defendant argued, even those smokers who try to increase their nicotine intake—including people accustomed to higher-yield cigarettes—can still receive less tar and nicotine from Marlboro Lights than they would from Marlboro Regulars.

In support of its argument, defendant cited, among other things, the deposition testimony of one of plaintiffs' intended witnesses, Dr. Benowitz, for the proposition that smokers who switch from higher-yield cigarettes to lower-yield cigarettes may compensate for the nicotine reduction not only by smoking each lower-yield cigarette more intensely, but also by smoking more of them. That testimony, defendant contended, supported its position that even those smokers who are most likely to engage in compensatory smoking behaviors can receive less tar and nicotine from

light cigarettes on a per-cigarette basis than they would from regular cigarettes. Defendant also introduced expert testimony stating that there was no scientific evidence that compensation (1) affected all smokers, (2) applied throughout a smoker's history, or (3) always resulted in receiving the same amount of tar and nicotine from a light cigarette as from a regular cigarette. According to one of defendant's experts, "the overwhelming majority of smokers who switch to lower-yield cigarettes from higher-yield cigarettes get significantly less tar and nicotine."

Given that evidence, defendant contended that it was likely that there were many putative class members who actually received less tar and nicotine from Marlboro Lights than they would have from Marlboro Regulars and, therefore, the class was not cohesive enough for the question of damages—that is, the question whether the putative class members had suffered ascertainable losses—to be litigated based on evidence common to the class.

Regarding causation, defendant argued that, in order for plaintiffs to prove, as required by ORS 646.638(1), that they had suffered ascertainable losses "as a result of" defendant's representations that Marlboro Lights were "Light" and had "Lowered Tar & Nicotine," plaintiffs would have to prove that they had relied on the representations. Plaintiffs could not do that on a class-wide basis, defendant argued, because "[it is] hard to imagine a more individualized issue than why a smoker chooses a particular brand of cigarettes." Defendant contended that consumers choose cigarette brands, including low-tar brands, for a variety of reasons. "For example," defendant suggested, "you could have someone who thought low[-]tar cigarettes were a little bit safer, but purchased the brand for completely other reasons, such as taste."

In support of its argument, defendant introduced a summary of surveys regarding smokers' beliefs about lower-yield cigarettes and their reasons for smoking them. Among the surveys were the following:

(1)  A 1986 survey by the Centers for Disease Control (CDC) in which 26 percent of light smokers and 48 percent

of ultra-light smokers said that their brand was "less hazardous than others";

(2)   A 1993 Gallup Poll in which, concerning the statement that smoking low-tar cigarettes was safer than smoking high-tar cigarettes, 51 percent of the smokers surveyed "agree[d]" or "strongly agree[d]" and 42 percent "disagree[d]" or "strongly disagree[d]";

(3)   A 1993 CDC survey of teenagers and young adults who smoked light or ultra light cigarettes in which the respondents identified their reasons for smoking light or ultra light cigarettes as follows: "[t]aste better" (33 percent), "[l]ess irritating" (29 percent), "[h]ealthier than other brands" (21 percent), and "[j]ust liked them" (19 percent); and

(4)   A 1998 Gallup Poll of light and ultra light smokers in which 33 percent of respondents said that they smoked light or ultra light cigarettes because they preferred the taste of the cigarettes and 35 percent said they smoked them for health-related reasons.

In addition, defendant cited newspaper and magazine articles that explained that smokers can consciously or unconsciously affect the amount of tar and nicotine they receive from cigarettes, including low-tar cigarettes that use dilution filters, by inhaling more deeply, by taking more puffs, or by covering the dilution holes. Those articles included the following:

(1)   A 1976 *Consumer Reports* article, *Less Tar, Less Nicotine: Is that Good?*, which stated that "[n]icotine is an addicting agent for most smokers. When cigarette smoke contains less nicotine than such smokers are accustomed to, their bodies simply contrive ways to get more smoke[,]" and that human smokers "do not necessarily smoke a low-nicotine cigarette in the same way they smoke a high-nicotine cigarette";

(2)   A 1982 *Oregonian* article, *Smokers at Risk Even on Low Tar*, which described the FTC Method and compensatory smoking behavior;

(3)   A 1983 *Newsweek* article, *Light Cigarettes Have Just as Much Nicotine*, which stated, "The widely touted notion that low-tar-and-nicotine cigarettes are safer than stronger brands is a pipe dream"; and

(4) A 1994 *Oregonian* article, *Smoking Information a Lot of Hot Air?*, which again described the FTC Method and stated that "[s]mokers of cigarettes labeled low in tar and nicotine may be getting more of those substances than they think."

According to defendant, those articles would have put consumers on notice that Marlboro Lights were not inherently light, and consumers who had such notice but purchased Marlboro Lights anyway would not have suffered an ascertainable loss "as a result of" defendant's representations.

Defendant also pointed to the smoking behaviors of the named plaintiffs, Pearson and Grandin. Although both switched to Marlboro Lights for health reasons, both were also aware, according to defendant, that they smoked Marlboro Lights more aggressively than their prior brand of cigarettes in order to get more nicotine. In addition, Pearson testified that she preferred the "taste" of Marlboro Lights to ultra light cigarettes, and Grandin testified she preferred the strength of Marlboro Lights to Marlboro Regulars. And Grandin was aware of the dilution holes in the filter and that her fingers covered some of them.

Based on the surveys, newspaper and magazine articles, and the testimony of the individual plaintiffs, defendant argued that it was likely that there were many putative class members who had not relied on its representations that Marlboro Lights were "Light" and had "Lowered Tar & Nicotine" and, therefore, the class was not cohesive enough for the question of causation—that is, the question whether the putative class members had suffered any ascertainable losses "as a result of" its representations—to be litigated based on evidence common to the class, as opposed to evidence specific to each individual class member.

Defendant acknowledged that, under ORCP 32 B, the predominance of common questions is not a requirement for class certification; it is only one of eight matters "pertinent to" whether a class action would be superior to other methods for adjudicating the dispute. But because the issues of causation and damages were central to the action, defendant argued that a class action would not be superior

because individual litigation of those issues would make the action unmanageable.

### b. *Plaintiffs' Arguments on Class Certification*

Plaintiffs disagreed with defendant about the facts that they would have to prove to establish the elements of damages and causation and whether those facts could be proved on a class-wide basis.

Regarding damages, plaintiffs argued that they did not need to prove that the Marlboro Lights that they and the putative class members had purchased did not actually deliver less tar and nicotine than Marlboro Regulars. Apparently focusing on their second claim, plaintiffs argued that they could establish that they and the putative class members had suffered ascertainable losses at the time of purchase because the Marlboro Lights were not "inherently lower in tar and nicotine than defendant's regular cigarettes." In other words, the content and design of the Marlboro Lights would not necessarily protect Marlboro Lights smokers from ingesting the same amount of tar and nicotine as they would have if they had smoked Marlboro Regulars. Instead, Marlboro Lights smokers could easily and subconsciously receive the same amount of tar and nicotine from Marlboro Lights as Marlboro Regulars. According to plaintiffs, that is because Marlboro Lights "were designed to deliver as near as possible the same level of tar and nicotine as that delivered by Marlboro [Regulars]." Thus, plaintiffs contended, "[W]hat we look at is the purchase under the UTPA. That's the moment that the ascertainable loss attaches. It's not somewhere down the road."

Plaintiffs reasoned that they and the putative class members had overpaid for Marlboro Lights because they had paid for a feature that had value—*viz.,* inherent lightness—that they did not actually receive. Plaintiffs told the trial court that they would present experts who could testify to the value of that feature, explaining that "you can do a willingness to pay survey and assess what the value is of the product * * * as it actually was versus what it would have been if it had been as represented." Plaintiffs argued that, because their theory was that they and the putative class members had suffered ascertainable losses at the time

of purchase—and, therefore, individual smoking behaviors were irrelevant—the question of damages was a common question that could be decided on a class-wide basis.

Regarding causation, plaintiffs argued that they did not have to prove that they and the putative class members had relied on defendant's representations that Marlboro Lights were "Lights" and had "Lowered Tar & Nicotine" because the representations were half-truths, in that they involved both an affirmative representation (that Marlboro Lights would deliver lowered tar and nicotine) and a material omission (that Marlboro Lights would deliver lower tar and nicotine only if smoked in particular ways). According to plaintiffs, "[t]he half-truth case involves a failure to disclose, and [a UTPA] plaintiff need not establish reliance when [the defendant] fail[ed] to disclose information." Relying on *Sanders v. Francis*, 277 Or 593, 598, 561 P2d 1003 (1977), in which the Supreme Court held that, when a representation that violates the UTPA "takes the form of a 'failure to disclose' under [ORS 646.608(2)], it would be artificial to require * * * that [the] plaintiff had 'relied' on that non-disclosure[,]" plaintiffs argued that they did not need to prove that they and the putative class members had relied on defendant's representations.

Alternatively, plaintiffs argued that, even if they had to prove such reliance, they could do so on a class-wide basis. They contended that class-wide reliance could be inferred from, among other things, the nature of the representations and defendant's marketing of Marlboro Lights. The representations appeared on every package of Marlboro Lights, concerned the distinguishing feature of Marlboro Lights, were intended to induce reliance, and were likely to have induced reliance given defendant's marketing of Marlboro Lights, which was well funded and supported by sophisticated psychological and behavioral research. For example, between 1976 and 1978, defendant spent $20 million advertising Marlboro Lights.

In support of their argument, plaintiffs cited a Philip Morris study for the proposition that, within a few years of the introduction of Marlboro Lights, 82 percent of consumers believed that the lower tar and nicotine representations

suggested a safer product that was, indeed, lower in tar, less dangerous and better for your health. Plaintiffs also pointed to defendant's own statements, made throughout the class period, denying or minimizing the health risks of smoking. Those statements, plaintiffs argued, effectively countered the newspaper and magazine articles on which defendant relied.

In addition, plaintiffs told the trial court that, at trial, they would present "consumer conduct experts [in] psychology [and] consumer behavior" who would testify that defendant's representations about Marlboro Lights "played a substantial part in every consumer's decision to purchase [Marlboro Lights,]" even though "it may not have been the only thing." Plaintiffs further argued that, if a person relied on the representations for any of his or her purchases, the person would properly be included in the class and would be entitled to damages for those purchases, although not for purchases made without the required reliance.

Finally, plaintiffs argued that, even assuming that the questions of causation and damages were individual questions, common questions still predominated and that a class action would be superior to another method because, if each class member had to bring his or her claim individually, then numerous issues would have to be litigated over and over again. In their memorandum in support of their motion for class certification, plaintiffs identified 17 issues of fact and 39 issues of law that they contended were "common." In light of those issues, plaintiffs claimed that a class action was superior to any alternative method for adjudicating the controversy.

### 3. *Trial Court's Decision*

After the hearing on plaintiffs' class-certification motion, the trial court took the motion under advisement and subsequently issued a letter opinion. The court first addressed the facts that plaintiffs would have to prove to establish the elements of damages and causation, and the court then addressed whether plaintiffs could litigate those facts based on evidence common to the class.

Regarding damages, the trial court rejected plaintiffs' argument that they could prove that they and the putative class members had suffered ascertainable losses simply by proving that Marlboro Lights are not inherently light. According to the court, it could not be inferred that an inherently light cigarette was worth more than the cigarettes that putative class members bought. Therefore, the court concluded that, in order to prove that they had suffered ascertainable losses, plaintiffs would have to prove that the Marlboro Lights that they and the putative class members purchased did not actually deliver less tar and nicotine than Marlboro Regulars. Specifically, the court ruled that plaintiffs would have to prove that, "for a given period of time during which a certain number of packs were purchased, the smoker of those cigarettes was on average receiving as much tar and nicotine from them as he or she would have received from the same number of Marlboro Regulars."

Regarding causation, the trial court concluded that, in order for plaintiffs to prove that they had suffered ascertainable losses as a result of defendant's representations, they would have to prove that they had relied on those representations. The trial court rejected plaintiffs' characterization of defendant's representations as failures to disclose. The court explained:

"I conclude that this case does not involve the type of 'failure to disclose' misrepresentation the *Sanders* court referred to when it said that in some UTPA cases reliance is not an element of causation. Plaintiffs allege here that the statement 'lowered tar and nicotine' was misleading because it was a half-truth. They contend that it was false because it did not explain that the statement was true if the cigarettes were smoked in a certain fashion by a machine, but not necessarily if they were smoked by a human being. Plaintiffs' theory is that if the full truth had been told, they would not have bought the cigarettes at all, or would not have paid as much as they did for them. Instead, being lulled by the half-truth, they bought Marlboro Lights. The theory still boils down to an assertion that what defendant *did say* was false. Such a theory requires proof of reliance."

(Emphasis in original.) Accordingly, the court concluded, plaintiffs would have to prove that "the name 'Lights' or the statement 'lowered tar and nicotine' was a substantial factor in [their and putative class members'] decision[s] to purchase each pack of Marlboro Lights for which recovery is sought."

Having determined the facts that plaintiffs would have to prove to prevail on their UTPA claims, the trial court turned to whether plaintiffs had carried their burden of demonstrating that it would be appropriate for the parties to litigate those facts based on evidence common to the entire class. The court first concluded that plaintiffs met the five requirements for class certification set out in ORCP 32 A: numerosity, commonality, typicality, adequacy, and notice.

The trial court then considered whether, as required by ORCP 32 B, plaintiffs had established that "a class action [was] superior to other available methods for the fair and efficient adjudication of the controversy." ORCP 32 B. As mentioned, ORCP 32 B identifies several matters pertinent to whether a class action is superior to other methods of adjudication. 257 Or App at 121-22 n 9. The court considered each of the matters and concluded that most were either neutral or weighed in favor of class certification. But the court denied plaintiffs' motion for certification because it concluded that "[t]he extent to which questions of law or fact common to the members of the class predominate over any questions affecting only individual members," ORCP 32 B(3), weighed against class certification. The court explained that, although there were "many questions of law and fact common to all the claims of members of the class," there were also "substantial issues unique to each class member" because "[e]ach class member would have to prove *both* that his or her reliance on the statement 'lowered tar and nicotine' was a substantial factor in making the purchase *and* that the person who smoked the cigarettes actually received something other than 'lowered tar and nicotine.'" (Emphasis in original.) Therefore, the court concluded, "common questions of fact [did] not predominate over the questions affecting only individual [class] members." To the contrary, "individual questions predominate[d] by a wide margin."

The trial court further concluded that plaintiffs had not carried their burden of demonstrating that the action qualified for certification as a class action because they had failed to present evidence that class-wide proof was available. The court explained:

> "Regardless of whether, as a matter of law, reliance and causation are susceptible to proof on a class-wide basis, plaintiffs have not presented evidence in this certification proceeding that such proof is available. I conclude that when plaintiffs seek class certification and assert that something can be proved on a class-wide basis, they have the burden in the certification proceeding to present evidence in support of that proposition. While the court does not determine the merits in the certification proceeding, it must have evidence, and not merely representations of counsel, that a type of proof is available."

The court also noted that its consideration of the manageability of the action, ORCP 32 B(7), "necessarily overlap[ped] with" its predominance analysis. Because common issues did not predominate, "[m]anagement of the class would be extraordinarily difficult because of the issues that would require individual adjudication for each class member."

The trial court considered plaintiffs' alternative request that it certify "the class as it relates to all specific common issues," as well as their request to certify a class for equitable relief, but it denied those requests on the ground that "[the] alternative proposals do not eliminate the main obstacle to certification of the whole case as a class action: the overwhelming predominance of individual issues." Because the court believed that the most fundamental issue in the case was "whether defendant's representation that a pack of Marlboro Lights would deliver lower tar and nicotine than Marlboro Regulars was false" and that the resolution of that issue depended on each individual's smoking methods, the court concluded that "individual questions would predominate."

Finally, the trial court explained that its conclusions that plaintiffs could not prove either damages or causation on a class-wide basis were "separate and independent

grounds for finding that individual questions predominate." In other words, it "would reach the conclusion that individual questions predominate over common questions (to a degree that requires denial of class certification) even if [its] finding on one of those issues were found on appeal to be wrong."

Defendant moved for summary judgment against plaintiffs' individual claims on several grounds, including preemption under the Federal Cigarette Labeling and Advertising Act, 15 USC §§ 1331-1341 (FCLAA). After the court denied plaintiffs' motion for class certification, the trial court concluded that plaintiffs' claims were preempted by the FCLAA, granted defendant's motion for summary judgment on that ground, and entered judgment for defendant. This appeal followed.

## III. ANALYSIS

Plaintiffs raise three assignments of error on appeal. First, they assert that the trial court erred in granting defendant's summary judgment motion on the ground that their claims are preempted by federal law. Second, they assert that the trial court erred by denying the motion for class certification on the ground that a class action would not be superior to other available methods of adjudication because individual questions would predominate over common ones. Third, they assert that the trial court erred in denying their alternative motion for certification of an issue class. We address the three assignments in turn.

A. *Preemption*

In their first assignment of error, plaintiffs assert that the trial court erred by granting defendant's motion for summary judgment on the ground that plaintiffs' claims are preempted by the FCLAA. After the trial court entered its judgment, the United States Supreme Court decided *Altria Group, Inc. v. Good*, 555 US 70, 129 S Ct 538, 172 L Ed 2d 398 (2008), holding that claims similar to plaintiffs' are not preempted by the FCLAA. The parties agree that *Altria Group* resolves plaintiffs' first assignment of error. In light of *Altria Group*, the trial court erred in granting defendant's motion for summary judgment on plaintiffs' individual claims.

## B.  *Class Certification*

In their second assignment of error, plaintiffs assert that the trial court erred in denying their request for class certification. They contend that the trial court erred in determining both the facts that they would need to prove to establish the elements of damages and causation and whether those facts could be proved on a class-wide basis.

### 1.  *Damages*

We turn first to the question of what plaintiffs would have to prove to establish the damages element of their UTPA claim—that is, that they had suffered an "ascertainable loss of money or property"—and whether the existence of those facts can be litigated on a class-wide basis.[10] ORS 646.638(1). Plaintiffs' claim, as narrowed by the time of the class-certification filings and hearing, is that they and the putative class members had suffered ascertainable losses because they had paid for Marlboro Lights that were represented to be inherently light but were not actually inherently light. For the reasons explained below, we conclude that, to establish that they had suffered ascertainable losses, plaintiffs would have to prove (1) that the Marlboro Lights that they and the other putative class members purchased were not inherently light, and (2) that inherent lightness is a feature that has value. We further conclude that, because those facts would not vary from class member to class member, they could be proved on a class-wide basis.

### a.  *What is required to prove an ascertainable loss*

Two Oregon Supreme Court cases have examined the nature of the element of ascertainable loss in UTPA claims: *Scott v. Western International Surplus Sales, Inc.*, 267 Or 512, 517 P2d 661 (1973), and *Weigel v. Ron Tonkin Chevrolet Co.*, 298 Or 127, 690 P2d 488 (1984).

---

[10] In our discussion of the facts that plaintiffs would need to prove to establish the element of damages and whether they could prove those facts on a class-wide basis, our focus is on the *fact* of damages, not the *amount* of damages. In other words, our focus is on the facts that plaintiffs would have to prove to establish that they had suffered an ascertainable loss. *See* ORS 646.638(1) (a private UTPA plaintiff must prove only that he or she suffered "*any* ascertainable loss" (emphasis added)).

In *Scott*, the plaintiff purchased a backpacking tent for his son from the defendant. The tent came in a package with a picture showing that it had eaves and a window that closed with a zipper. Both of those features were important to the plaintiff because his son intended to use the tent for camping in the snow. But the tent did not have either feature. After the defendant refused to refund the plaintiff's money, the plaintiff brought a UTPA action, pursuant to ORS 646.638(1), seeking the minimum statutory damages of $200. The trial court found for the plaintiff and awarded the statutory damages, punitive damages, and attorney fees. On appeal, the defendant argued that the plaintiff had failed to prove that he had suffered an ascertainable loss. The Supreme Court rejected that argument, holding that, based on the evidence that the plaintiff had paid $38.86 for the tent, a trier of fact could infer that a tent without those features would have a value of less than $38.86. 267 Or at 515-16.

In *Weigel*, the plaintiff brought a UTPA action against the defendant, a car dealer. The defendant had sold the plaintiff a car, which it had represented to be new despite the fact that another purchaser had taken it home but then returned it after being unable to complete the purchase. A jury returned a verdict for the plaintiff, and the defendant appealed.

The Supreme Court held that the car's history made it a used car as a matter of law. 298 Or at 131-32. The court then considered whether the plaintiff had suffered an ascertainable loss. The court explored the possibility that the mere frustration of the consumer's reasonable expectations—through receiving a product with characteristics different from those represented—constituted an ascertainable loss. *Id.* at 136-37. It noted that the Connecticut Supreme Court had held that, under that state's unfair trade practices act, the fact that a loss "does not consist of a diminution of value is immaterial" and, as an example, had pointed out that, "'[t]o the consumer who wishes to purchase an energy saving subcompact, for example, it is no answer to say that he should be satisfied with a more valuable gas guzzler.'" *Id.* at 137 (quoting *Hinchcliffe v. American Motors Corporation*, 184 Conn 607, 440 A2d 810, 814 (1981)).

But, after considering the nature of the UTPA and cases interpreting other states' equivalent statutes, the Supreme Court concluded that it did not need to determine whether a theory of ascertainable loss based on frustration of consumer expectations comported with Oregon law. *Weigel*, 298 Or at 137. As in *Scott*, where the court had "'inferred' that a tent lacking certain features would have a value below the price that was charged upon a representation that included these features," *Weigel*, 298 Or at 137, the court held that there was evidence from which the jury could have found that the car the plaintiff had purchased was worth less than it would have been worth had it been new, as represented; specifically, the plaintiff had testified that the car would have been worth less if he had known its history, and the defendant's salesperson had testified that the car would have been less valuable if it had been used. *Id.* The court concluded that that evidence provided a sufficient basis for the jury to conclude that the plaintiff had suffered an ascertainable loss. *See also Feitler*, 170 Or App at 712 ("'Ascertainable loss' under the UTPA is amorphous. Any loss will satisfy that requirement so long as it is 'capable of being discovered, observed, or established.'" (Quoting *Scott*, 267 Or at 515.)).

Thus, *Scott* and *Weigel* establish that one way a UTPA plaintiff can prove that he or she has suffered an "ascertainable loss of money or property," ORS 646.638(1), is by showing that he or she has purchased a product that was represented to have a feature of value but that did not actually have that feature and, therefore, was less valuable. The difference in value may be proved in various ways. For example, it may be inferred from the nature of the feature, *Scott*, 267 Or at 515-16 (trier of fact could infer that tent with features that would provide greater protection from the elements was worth more than a tent without the features), or from opinion evidence, *Weigel*, 298 Or at 137 (jury could infer from testimony by plaintiff and by defendant's employee that car would have been more valuable if it had not been taken home and then returned by prior purchaser).[11]

---

[11] We note that, in Scott, the plaintiffs sought only the minimum statutory damages of $200 and, therefore, the amount of their actual damages was not an issue. Nevertheless, it applies to this case, even though plaintiffs are seeking more

Applying the rules from *Scott* and *Weigel,* we conclude that plaintiffs demonstrated that, given the theory of their case, whether they and the putative class members have suffered ascertainable losses can be litigated on a class-wide basis. Plaintiffs' claim is that they purchased a product that was represented to have a feature of value but that did not actually have that feature. Their loss was, at a minimum, the value of that feature.

The trial court held that evidence that a product is not as represented is not enough to establish that the person who purchased the product has suffered an ascertainable loss. That may be true. *Weigel,* 298 Or at 137 (leaving open the question whether frustration of a consumer's reasonable expectations can constitute an ascertainable loss under the UTPA). For example, it may be that a person who purchased a product that is *more valuable* than it was represented to be cannot be said to have suffered an ascertainable loss. To use the trial court's example, it is possible that a person who purchased a stone that was represented to be a cubic zirconium but that was actually a diamond cannot be said to have suffered an ascertainable loss. But that example is inapt here because plaintiffs' theory is that they received a product that was *less valuable* than it was represented to be.

b. *Whether damages can be proved on a class-wide basis*

Plaintiffs' theory is one that can be litigated based on evidence common to the proposed class. Just as in *Scott,* where the jury could have inferred that a tent with more

than the minimum statory damages, because, along with Weigel, Scott establishes rules that govern the determination whether a UTPA plaintiff has suffered any damages.

Regarding the minimum statutory damages, at the times that plaintiffs filed this case, that the trial court decided the class-certification issue, and that the court entered the final judgment, *former* ORCP 32 K prohibited awarding those statutory damages in a class action. The legislature repealed *former* ORCP 32 K in 2009 and replaced it with ORS 646.638(8)(a), which permits such an award if the defendant acted recklessly or knowingly. The new provision applies to all cases that were pending at the time of the change except those cases in which a judgment was entered before the act's effective date. Or Laws 2009, ch 552, § 7. The parties do not refer to the statutory change, and we express no opinion on its applicability in cases where, as here, a pre-enactment judgment is subsequently reversed on appeal.

protective features would be more valuable than a tent without those features, here, a jury could infer that an inherently light cigarette would be more valuable than a potentially light cigarette; it could infer that the inherently light cigarette would be more protective than the potentially light cigarette and that the difference in protection has value. From there, a jury could find that a person who had purchased what was represented to be an inherently light cigarette but was actually only a potentially light cigarette had suffered an ascertainable loss because the person overpaid. It could infer that a cigarette that did not have a represented feature "would have a value below the price that was charged upon a representation that included [the] feature[.]" *Weigel*, 298 Or at 137.

In this case, in addition to relying on the inference that an inherently light cigarette would be more valuable than a potentially light cigarette, plaintiffs told the court that they would present evidence that the feature of inherent lightness has value. Specifically, they told the court that they would present experts who could testify about the difference in value between an inherently light cigarette and a potentially light cigarette.

Whether an inherently light cigarette would be more valuable than a potentially light cigarette is a matter for the jury. At the class-certification stage, the trial court's task is to determine whether the question can be proved based on evidence common to the class—it is not to resolve the question on the merits. *See Newman*, 287 Or at 51 (the class certification stage is "not an appropriate time to determine whether plaintiffs are entitled to prevail"). Given plaintiffs' theory of damages, the trial court should have concluded that the question whether the putative class members had suffered damages—that is, whether they had suffered an ascertainable losses—does not involve any individual issues.

Defendant argues that, even assuming that the Marlboro Lights that plaintiffs and the putative class members purchased would not necessarily deliver less tar and nicotine than Marlboro Regulars, plaintiffs cannot prove that they had suffered any ascertainable losses because Marlboro Lights and Marlboro Regulars were always priced

the same. Defendant focuses on the wrong comparison. As discussed above, to determine whether plaintiffs and the putative class members overpaid, the appropriate comparison is between the value of the *represented product* and the value of the *received product.* A comparison to the existence and price of a third product—Marlboro Regulars—different from the one that putative class members actually bought (a potentially light cigarette) and from the one that defendant represented that putative class members were buying (an inherently light cigarette) is not determinative.

In sum, contrary to the trial court, we conclude that the question whether plaintiffs and the putative class members had suffered any ascertainable losses could be litigated on a class-wide basis and, therefore, did not weigh against class certification.

2. *Causation*

We turn next to the question of the facts that plaintiffs would have to prove to establish causation and whether they could prove those facts on a class-wide basis.

a. *Facts required to prove causation*

As they did in the trial court, plaintiffs argue that, when a plaintiff in a UTPA action alleges that the defendant committed an unlawful trade practice by failing to disclose information, the plaintiff does not need to prove that he or she had relied on the undisclosed information. Plaintiffs base their argument on *Sanders*, in which the Supreme Court held that "[w]hether ORS 646.638(1) requires reliance as an element of causation necessarily depends on the particular unlawful practice alleged." 277 Or at 598-99.

In *Sanders*, the plaintiff brought a UTPA claim against automobile dealers, on the ground that they had sold her a used car for $3,898 despite having advertised the car for $3,098 both the day before and a few days after she bought it. On the defendants' demurrer, the trial court dismissed the plaintiff's action. The plaintiff appealed, and the Supreme Court reversed.

On appeal, the defendants' primary contention was that the plaintiff had failed to plead that the alleged

unlawful trade practice had *caused* her any ascertainable loss. According to the defendants, the plaintiff was required, but had failed, to allege that she had relied on the unlawful trade practice. The Supreme Court began its analysis by determining that the plaintiff's allegations were based on ORS 646.608(1)(i)—which provided, in part, that it was an unlawful trade practice for a person to "[a]dvertise[] * * * goods * * * with intent not to sell them as advertised"—and ORS 646.608(1)(j)—which provided, in part, that it was an unlawful trade practice for a person to "[m]ake[] false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions." 277 Or at 596-97. The court then considered the defendants' argument that the plaintiff had to plead reliance. As the court noted, the defendants' argument was based on "the requirement that [the] plaintiff's loss be the 'result' of [the] defendant's willful use of the unlawful practice." *Id.* at 598. The court rejected the argument, holding that whether a UTPA plaintiff must prove that he or she relied on an unlawful trade practice depends on the unlawful trade practice alleged. *Id.* at 598-99. In a paragraph quoted by plaintiffs in this case, the court explained:

> "*In many cases plaintiff's reliance may indeed be a requisite cause of any loss,* i.e., *when plaintiff claims to have acted upon a seller's express representations.* But an examination of the possible forms of unlawful practices shows that this cannot invariably be the case. *Especially when the representation takes the form of a 'failure to disclose' under* [*ORS 646.608(2)*], *as in this case, it would be artificial to require a pleading that plaintiff had 'relied' on that non-disclosure.* Similarly, if the particular violation of paragraph (i) is a sale made in willful disregard of the advertised price, and intended at the time of the advertisement, then [the] plaintiff's damage results precisely from [the] defendant's reliance on her ignorance, not from [the] plaintiff's reliance on [the] defendants' advertisement."

*Id.* at 598 (footnote omitted; emphasis added). Accordingly, the court concluded that the plaintiff did not need to plead that she had relied on the defendant's advertised lower price and, therefore, the trial court had erred in dismissing the plaintiff's claim. *Id.* at 599.

Three years later, in *State ex rel Redden v. Discount Fabrics*, 289 Or 375, 384, 615 P2d 1034 (1980), the Supreme Court explained that its holding in *Sanders* illustrated the differences between a UTPA claim and a common-law fraud claim: Although reliance is an element of common-law fraud, it is not necessarily an element of a UTPA claim. 289 Or at 384.[12] The court reiterated its *Sanders* holding, stating that, in a UTPA action, "whether reliance [is] a necessary element depend[s] upon the type of violation alleged and *** reliance [is] not required in nondisclosure cases." *Id.*

We followed *Sanders* and *Redden* in *Feitler*. There, the plaintiff brought a UTPA action against the defendant, who had sold him 47 drawings from an early animated film. The defendant had told the plaintiff, in two separate statements, that the drawings were the only ones that he had from the film. The defendant's statements were false; he had four additional drawings from the film. In the UTPA action, the plaintiff alleged that the defendant had committed an unlawful trade practice, as defined by ORS 646.608(1)(e), by representing that the 47 drawings had "'characteristics, *** quantities or qualities that they [did] not have.'" *Feitler*, 170 Or App at 707 (quoting ORS 646.608(1)(e)). Specifically, he alleged that the defendant had misrepresented the exclusivity of the drawings. The trial court found in the defendant's favor, concluding, among other things, that the defendant's statements that the 47 drawings were the only ones that he had from the film did not constitute a misrepresentation of the characteristics of the 47 drawings for the purposes of ORS 646.608(1)(e). The plaintiff appealed, and we reversed, holding that, "[i]n the context of collectible items, the existence or nonexistence of other items within the same finite set is a fact of significance to any reasonable collector." 170 Or App at 711. Notably, we remanded the case to the trial court to determine, as a factual matter, whether the plaintiff had relied on the defendant's false statements. We explained:

---

[12] As the Supreme Court has explained, the elements of a UTPA claim are "distinct and separate " from the elements of common-law fraud, and a violation of the UTPA is "much more easily shown." *Wolverton v. Stanwood*, 278 Or 709, 713, 565 P2d 755 (1977); *Raudebaugh v. Action Pest Control, Inc.*, 59 Or App 166, 171, 650 P2d 1006 (1982) ("Had the legislature intended that a consumer prove all the elements of common[-]law fraud in order to recover damages, it would have been unnecessary to create a cause of action by statute.").

> "Where, as here, the alleged violations are affirmative misrepresentations, the causal[] 'as a result of' element requires proof of reliance-in-fact by the consumer. *See Sanders* \* \* \* (*although reliance is not always required to satisfy the 'result of' language in ORS 646.638(1), 'when plaintiff claims to have acted on a seller's express representations' factual reliance is indeed essential*)."

*Id.* at 708 (emphasis added). Thus, in order for the plaintiff to prevail on his UTPA claim, he had to prove not only that the seller had made false statements about the exclusivity of the drawings, but also that he, the plaintiff, had relied on those statements when he purchased the drawings.

As *Redden* and *Feitler* illustrate, *Sanders* has been construed as creating a rule that a UTPA plaintiff needs to prove that he or she relied on the defendant's representation if the representation takes the form of an affirmative misstatement of a fact but not if it takes the form of a failure to disclose a fact. The parties employ that distinction in support of their arguments on appeal, as they did in the trial court.

Plaintiffs argue that "[defendant] provided the classic omission and half-truth when it represented its 'light' cigarettes would deliver low tar and nicotine" but failed to disclose that, in order to receive lower tar and nicotine, a consumer would have to smoke the cigarettes in a particular way. They contend that, "as in *Sanders*, the violation here arises out of the information that [defendant] failed to disclose to plaintiffs; this 'failure to disclose a fact' is an actionable omission under ORS 646.608(2)." Quoting *Sanders*, 277 Or App at 298, plaintiffs assert that, because defendant failed to disclose that Marlboro Lights would deliver less tar and nicotine only if smoked in a particular way, "'it would be artificial to require a pleading that plaintiff[s] had "relied" on that non-disclosure.'"

Defendant argues that this is a case involving "affirmative misrepresentations" and, therefore, plaintiffs have to prove reliance. It further argues that, even if the alleged misrepresentations are "half truths," plaintiffs must prove reliance in "half-truth" cases, citing *Stroup v. Conant*, 268 Or 292, 296-97, 520 P2d 337 (1974); *Meyer v. E. M. Adams & Co.*, 268 Or 91, 97-98, 519 P2d 375 (1974); and *Krause v. Eugene Dodge, Inc.*, 265 Or 486, 506, 509 P2d 1199 (1973).

As set out above, the trial court concluded that this case "does not involve the type of 'failure to disclose' misrepresentation the *Sanders* court referred to when it said that in some UTPA cases reliance is not an element of causation." 257 Or App at 130. The court noted that plaintiffs characterized defendant's statements as half-truths, but concluded that plaintiffs' theory "still boil[ed] down to an assertion that what defendant *did say* was false. Such a theory requires proof of reliance." (Emphasis in original.)

We agree with the trial court. As the Supreme Court held in *Sanders,* the facts that a UTPA plaintiff must prove in order to establish causation—*viz.*, that he or she suffered an ascertainable loss "as a result of" an unlawful trade practice—"necessarily depend[] on the particular unlawful practice alleged." 277 Or at 598-99. If the alleged unlawful trade practice is a failure to disclose information, the plaintiff is not required to prove reliance on the undisclosed information; it would be "artificial" to require the plaintiff to do so. *Id.* at 598. But, if the unlawful trade practice is an "express representation[]," then the plaintiff must prove reliance. *Id.*; *see also Feitler*, 170 Or App at 708.

The distinction between misleading actions and misleading omissions is not always clear and may be malleable. As another court has recognized in the fraud context, "[e]very fraud case based on material misrepresentation [can] be turned facilely into a material omissions case[.]" *Beck v. Cantor, Fitzgerald & Co., Inc.*, 621 F Supp 1547, 1556 (ND Ill 1985) (quoted in *State Treasurer v. Marsh & McLennan Companies, Inc.*, 241 Or App 107, 119, 250 P3d 371 (2011)). Indeed, as defendant suggests, it may be possible to characterize a transaction as involving either a misleading action or a misleading omission or, most likely, both, because every lie is accompanied by a failure to disclose the truth. For example, the transaction in *Feitler* could be characterized as involving a misstatement of fact (that the 47 drawings were the only ones the defendant had from the film) or a failure to disclose a fact (that the defendant had four additional drawings). Therefore, rather than attempt to identify a universal distinction between a misstatement of fact that is false because it is incomplete and a failure to disclose a fact that is itself a representation, we focus on the

fundamental holding of *Sanders*: Whether a plaintiff must prove reliance on an alleged misrepresentation or other unlawful trade practice depends on the facts and law that apply to the plaintiff's particular claim.

Here, plaintiffs alleged that (1) defendant falsely represented that Marlboro Lights were inherently light, (2) the false representation caused smokers to believe that Marlboro Lights had a characteristic that they did not and do not have, and (3) plaintiffs suffered ascertainable losses because they purchased Marlboro Lights that were not as represented. 257 Or App at 118. Inherent in plaintiffs' allegations is a claim that they relied on the representations. Plaintiffs allege that defendant's representations caused them to believe something that was not true and that they acted on that belief. For that type of allegation, proof of reliance is required. *Sanders*, 277 Or at 598; *Feitler*, 170 Or App at 708. The representations cannot have caused plaintiffs ascertainable losses if plaintiffs disregarded them.

This case is distinguishable from *Sanders*, in which the alleged unlawful trade practices, as identified by the Supreme Court, were advertising goods with the intent not to sell them as advertised, ORS 646.608(1)(i), and failing to disclose the existence of a price reduction, ORS 646.608(1)(j). A person can suffer an ascertainable loss as a result of those unlawful practices without being aware of, or relying on, them.[13]

In addition, plaintiffs are not being put in the untenable position—advanced by the defendant in *Sanders*—of having to prove reliance on undisclosed information. The alleged undisclosed information in this case was that Marlboro Lights would not necessarily deliver less tar and nicotine than regular cigarettes, and, of course, plaintiffs

---

[13] Under *Sanders*, if a seller advertises a product at a particular price, but intends to sell it at a higher price, the seller has engaged in an unlawful trade practice and a buyer who buys the product at the higher price suffers an ascertainable loss as a result of the unlawful practice because he or she has been overcharged. In other words, the law treats the advertised price as the actual price and a buyer who is charged more suffers a loss regardless of whether the buyer is aware of the actual price. Similarly, if a seller fails to disclose a discount, a buyer who pays full price suffers an ascertainable loss because he or she has been overcharged, and the loss is not dependent on whether he or she knew of the discount.

do not have to prove that they relied on that information. Instead, like the plaintiff in *Feitler*, who claimed to have suffered an economic loss when he purchased drawings that were represented to have a feature of value that they did not actually have, plaintiffs must prove that they relied on defendant's representations.

In support of their claim that they do not have to prove that they relied on defendant's representations, plaintiffs cite *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass 381, 396-97, 813 NE2d 476, 488-89 (2004), a Massachusetts case involving a claim brought under that state's unlawful trade practices statute. However, *Aspinall* is inapposite because, under the Massachusetts statute, deceptive advertising is deemed to "effect[] a per se injury on consumers." *Id.* at 402, 813 NE2d at 492. Therefore, in Massachusetts, the purchase of an intentionally falsely represented product can be, by itself, an injury under the state's unlawful trade practices statute; the statute does not require proof of reliance. *Id.* at 394, 813 NE2d at 486. That is not the law in Oregon, where the Supreme Court has held that whether proof of reliance is required for a UTPA claim depends on the unlawful trade practice alleged, *Sanders*, 277 Or at 598-99, and we have held that, in a case where a plaintiff claims to have acted on an express representation, proof of reliance is essential, *Feitler*, 170 Or App at 708.[14]

Plaintiffs also contend that "no proof [of reliance] is necessary where the defendant is under an independent duty to speak the truth." They cite *Tri-West Const. v. Hernandez*, 43 Or App 961, 971-72, 607 P2d 1375 (1979), *rev den*, 288 Or 667 (1980), and *Krause*, 265 Or at 505, in support of that

---

[14] The securities cases on which plaintiffs rely are similarly inapposite. As plaintiffs acknowledge, securities actions are governed by Oregon and federal statutes other than the UTPA. Under Oregon statutes governing securities actions, reliance is not required regardless of whether the improper practice is an omission or an affirmative misrepresentation. *See Everts v. Holtmann*, 64 Or App 145, 152, 667 P2d 1028 (1983) (Oregon securities law "imposes liability without regard to whether the buyer relies on the omission or misrepresentation"). And plaintiffs do not advance any reason that, in cases under Oregon's UTPA, we should import the presumption of reliance that is available under certain circumstances in federal securities cases. *See, e.g., Affiliated Ute Citizens v. United States*, 406 US 128, 153, 92 S Ct 1456, 31 L Ed 2d 741 (1972) (where the circumstances involved "primarily a failure to disclose, positive proof of reliance [was] not a prerequisite to recovery").

argument. In their view, *Tri-West* establishes that proof of reliance is not required under the UTPA whenever the defendant is under an "independent duty" to provide information to the plaintiff—and *Krause* supplies the relevant duty. In *Krause*, a common-law fraud case, the Supreme Court stated, "one who makes a representation to the purchaser of a product in the nature of a 'half-truth' thereupon assumes the affirmative obligation to make a 'full and fair disclosure' of the 'whole truth' even though he would have had no such obligation had he not undertaken to state such a half-truth." 265 Or at 505 (citation omitted). As we understand it, plaintiffs' argument is that, under *Tri-West*, they do not have to prove reliance because defendant had a duty not to tell a half-truth.

But if, as plaintiffs suggest, a seller has a duty not to tell a half-truth, we see no reason why a seller would not also have a duty not to tell a whole lie. And the existence of that duty does not relieve a UTPA plaintiff from having to prove reliance. For example, in *Feitler*, the defendant presumably had a duty not to make an affirmative misrepresentation to the plaintiff about the exclusivity of the drawings. But that duty did not relieve the plaintiff from having to prove that he had relied on the misrepresentation.

    b.   *Whether reliance can be proved on a class-wide basis*

Having determined that plaintiffs have to prove reliance, we must now determine whether they could do so based on evidence common to the class. In other words, we must determine whether, in this case, the question of reliance is a common question or an individual one. To do that, we begin by examining three cases involving similar determinations: *Bernard v. First Nat'l Bank*, 275 Or 145, 550 P2d 1203 (1976); *Derenco v. Benj. Franklin Fed. Sav. and Loan*, 281 Or 533, 577 P2d 477, *cert den*, 439 US 1051 (1978); and *Guinasso v. Pacific First Federal*, 89 Or App 270, 749 P2d 577, *rev den*, 305 Or 672 (1988). Each of those cases presented the question whether, for class-certification purposes, common issues predominated over individual ones.

In *Bernard*, the plaintiffs, who had obtained loans from the defendant banks, brought actions on behalf of themselves and all other similarly situated borrowers to recover "'overcharges of interest.'" 275 Or at 147. The plaintiffs' loan agreements stated that the banks would charge interest on a "per annum" basis, and the plaintiffs alleged that the banks had breached the agreements by charging them interest based on a 360-day year rather than the actual 365-day year and, thereby, increasing the plaintiffs' interest rates without their knowledge or consent.[15]

The plaintiffs moved for an order allowing the actions to proceed as class actions. At the time, class actions were governed by *former* ORS 13.220 (1973), *repealed by* Or Laws 1979, ch 284, § 199. Subsection (1) of the statute identified five requirements for a class action: a numerous class, common questions of law and fact, representative parties whose claims and defenses were typical of those of the class and who would fairly and adequately represent the class, and, in an action for damages, compliance with prelitigation notice requirements. *Former* ORS 13.220(1). As such, it was the forerunner to ORCP 32 A. Subsection (2) of the statute identified additional requirements for a class action and, as such, it was the forerunner to ORCP 32 B. Subsection (2) provided, in part:

> "An action may be maintained as a class action if the prerequisites of subsection (1) of the section are satisfied, and in addition:

> "* * * * *

---

[15] As the Supreme Court explained in *Bernard*,

"defendant banks employ three different methods of computing interest depending upon the classification of the type of loan. Two of these methods, referred to as the '365/365' and '360/360' methods, produce the same amount of interest over a 365-day year without any distortion of the nominal interest rate. The third way, the '365/360' method which is at issue here, produces a greater amount of interest over a period of 365 days than either of the two other methods. In effect, the 365/360 method assesses the nominal yearly rate of interest every 360 days."

275 Or at 147. The use of the 365/360 method results in the assessment of interest at a rate that exceeds the nominal interest rate by 1.388 percent of the nominal interest rate. *Id.* at 148.

"(c) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Common questions of law or fact shall not be deemed to predominate over questions affecting only individual members if the court finds it likely that final determination of the action will require separate adjudications of the claims of numerous members of the class, unless the separate adjudications relate primarily to the calculation of damages."

*Former* ORS 13.220(2).

Thus, to maintain an action as a class action under *former* ORS 13.220(2)(c), a plaintiff had to show that common questions predominated and that a class action was superior to other methods of adjudicating the controversy. Common questions would not predominate if it was "likely that final determination of the action [would] require separate adjudications of the claims of numerous members of the class, unless the separate adjudications relate[d] primarily to the calculation of damages." *Former* ORS 13.220(2)(c).

In *Bernard*, the defendant banks denied that they had failed to disclose the fact that they used a 360-day year to calculate interest on the plaintiffs' loans. Alternatively, they denied that the plaintiffs lacked knowledge of that fact. Based on those denials, the defendants argued that class certification was not appropriate because, in their view, whether each plaintiff and class member knew or was on notice of the fact that the defendants used a 360-day year to calculate interest was an individual question; that is, it was a question about which the defendants were entitled to make inquiries of each class member. Therefore, according to the defendants, it was "likely that final determination of the action [would] require separate adjudications of the claims of numerous members of the class," and, as a result, common issues would not predominate over individual ones.

After considering affidavits, depositions, and documentary evidence submitted by the parties, the trial court issued an order allowing the actions to be maintained as class actions. The trial court certified the order as appropriate for an immediate interlocutory appeal, and the

Supreme Court allowed the appeal. On appeal, the issue was whether questions common to the class members predominated over questions affecting only individual class members.

To resolve the issue, the Supreme Court first focused on the standard of review and held, "The finding that common questions of fact predominate is a conclusion of law despite its being labeled a finding of fact." 275 Or at 153. Accordingly, the court explained that, although it was bound by any findings of historical fact made by the trial court, it was "not bound by the trial court's conclusion regarding predominance of common questions because whether the facts justify such a conclusion is a matter of law." *Id.* at 154. To illustrate, the court explained that, if the trial court had determined, based on evidence in the record, "that five per cent of the borrowers knew of the banks' method of computing interest at the time they borrowed, its determination would constitute a finding of fact. However, a deduction therefrom that the common questions predominate over questions affecting only individual members of the proposed class would be a conclusion of law." *Id.* at 153-54. The court analogized its review of a trial court's conclusion that common issues predominate to its review of a trial court's conclusion that a criminal defendant's admission was voluntarily made. *Id.* at 154 (citing *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968)); *see also State v. Bishop*, 49 Or App 1023, 1027, 621 P2d 1196 (1980), *rev den*, 290 Or 727 (1981) (a reviewing court has "a duty to draw [its] own conclusions" regarding the voluntariness of a defendant's admissions).

Thus, the Supreme Court's task in *Bernard* was to determine, based on the record created in the trial court, whether common questions predominated over individual questions as a matter of law. 275 Or at 154. In doing so, the court would have been bound by the trial court's factual findings, but the trial court had not made any. *Id.*

The Supreme Court began its analysis by reviewing the legislative history of the class-action statutes, including the predominance requirement in *former* ORS 13.220(2)(c). The court observed that class actions were intended to be time-saving consolidation devices for courts and that the

predominance requirement was "intended to prevent cases being certified as class actions when questions concerning individual claims would be so numerous as to impose an impractical burden upon the court thereby destroying the value of consolidation." 275 Or at 152. Based on the text of *former* ORS 13.220(2)(c) and the purpose of the predominance requirement, the court held that whether an action can be maintained as a class action depends on whether it is "'likely'" that the action will involve individual adjudications "so 'numerous' as to make a class action impractical by placing too great a burden upon the court." 275 Or at 158-59 (quoting *former* ORS 13.220(2)(c)).

The Supreme Court observed that, "[i]f plaintiffs have presented a case which is otherwise proper for a class action, it would be unreasonable to construe [*former* ORS 13.220(2)(c)'s predominance requirement] to mean that defendants can automatically prevent such an action from proceeding by dreaming up a theoretical defense requiring individual inquiries, for which there is little basis in fact." 275 Or at 158. Thus, if "an issue or defense" does not have "sufficient basis and substance to justify its litigation in 'numerous' instances," it cannot be a basis for avoiding a class action. *Id.* "On the other hand," the court further observed, "if, at the time the court must first rule on whether the case may proceed as a class action, it appears probable that an issue or defense which requires a separate adjudication as to each claim does have substance in enough instances to justify the defendants' asserting it, we believe the legislature intended that the case should not proceed as a class action." *Id.* at 159. The court reasoned that, in enacting the class-action statute, the legislature intended to facilitate consolidation of cases, not to change the procedural or substantive law in a manner that would alter the rights of parties. *Id.* The court explained:

> "To hold that a case may proceed as a class action when there appears to be a legitimate issue or defense which will require an individual inquiry of a considerable number of the claimants would attribute to the legislature an intention either to overload the courts with an unmanageable proceeding or to deprive the defendants of valuable procedural and substantive rights by preventing them from

asserting what appears to be a bona fide defense. One or the other would be the inevitable result. We attribute to the legislature neither intention in the absence of a specific indication that it so desires."

*Id.* at 159.[16]

Plaintiffs seeking to maintain an action as a class action have the burden of proving that the requirements for doing so are satisfied. *Id.* at 154. Therefore, in *Bernard,* the plaintiffs bore the burden of proving that common questions predominated. The defendant banks argued that common questions did not predominate because, they claimed, many of the plaintiffs knew or should have known that they were being charged interest according to the 365/360 method as opposed to the 365/365 method. As the court explained, the plaintiffs' knowledge was relevant because,

"[i]f a claimant had knowledge at the time he secured his loan that the bank was intending to compute interest thereon by the 365/360 method, or if he had information which would put him on inquiry [notice] as to the method of computation, he would not be entitled to recover, because computation by the 365/360 basis would be a term of the contract with respect to such borrowers."

*Id.* at 157.

Accordingly, the Supreme Court turned to whether the defendants' claim that the plaintiffs knew or should of have known about the defendants' method of calculating interest had a "sufficient basis and substance to justify its litigation in 'numerous' instances." *Id.* at 158. The court noted that the class included people who had obtained "commercial loans, many of which would be large sums for business purposes[,]" *id.* at 161, and that people who obtain such loans "use money as a commodity" and "employ accountants

---

[16] The court also noted:

"We cannot imply from the mere enactment of a class action statute * * * that the legislature intended to abrogate settled principles of substantive and procedural law simply to make the class action manageable in instances where it presently is not. * * * To the extent that the class action requires novel substantive and procedural methods to obviate the necessity for, and resulting burden of, numerous individual inquiries, we must demand an explicit expression of the legislature laying out the rules of the game."

275 Or at 159 n 5.

and money managers who are knowledgeable about the cost of money[,]" *id.* at 162. Indeed, the court noted, the comptroller of one of the representative plaintiffs had testified that, among accountants, it was generally known that banks calculate interest in a variety of ways, including by using a 360-day year. *Id.* at 161. That testimony, the court held, gave rise to a legitimate question whether the comptroller "should have been put on notice to inquire as to the manner in which the bank was computing the interest on its loans." *Id.* The court also noted that one of the plaintiffs had borrowed money from one of the defendants more than 40 times, sometimes with the purpose of loaning to others, and "was described as being extremely rate conscious." *Id.* According to the court, although that plaintiff testified that he was unaware of the 365/360 method of computing interest, the circumstances gave rise to a "legitimate question *** whether his knowledge was so limited." *Id.* The court concluded:

"On the record before us plaintiffs have not carried the burden of proof of the predominance of common questions. They have shown that the banks did not discuss their method of computing interest with their borrowers and that some bank officials were not aware of the 365/360 method, but it does not follow that regular borrowers for business purposes would not be on notice of it.

"Plaintiffs have introduced no evidence from which we can conclude, in view of the realities of commercial borrowing, that the number of borrowers who would be legitimately subject to challenge on the issue of knowledge is less than 'numerous.' From the record, it appears probable that many claimants' knowledge will legitimately be in issue and that separate adjudications of the claims of numerous members of the class will be required to dispose of the question of defendants' liability. In such situations the statute dictates that common questions do not predominate and that the case is not a proper one for a class action."

*Id.* at 162. Thus, even though the defendant banks had not disclosed the method of computing interest and some of the defendants' own officials were unaware of the method the defendants used to calculate the plaintiffs' interest, the court concluded that the defendants' claim that the plaintiffs knew or should have known how the defendants calculated

their interest had a "sufficient basis and substance to justify its litigation in 'numerous' instances." *Id.* at 158. Accordingly, the Supreme Court reversed the trial court's order allowing the action to proceed as a class action. *Id.* at 169.

Shortly after *Bernard*, the Supreme Court decided *Derenco*, in which it affirmed the trial court's certification of a class action. 281 Or 533. In *Derenco*, the plaintiff, a corporation, brought an action against the defendant on behalf of itself and others who had borrowed money from the defendant to purchase single-family homes. The terms of the loans required the borrowers to make monthly deposits to be used for their future tax and insurance-premium payments. The defendant used the deposits to pay the taxes and insurance premiums when they eventually came due, but, until that time, the defendant used the deposits for its own purposes. It invested them and retained the income from the investments.

On behalf of itself and the class, the plaintiff claimed entitlement to the income that the defendant had derived from its investment of the deposits. The trial court certified the action as a class action and entered a judgment in favor of the plaintiff and the class. Thereafter, the parties sought and obtained Supreme Court review in order to "secure a final determination of controlling issues before entertaining statements of claim from class members under [*former*] ORS 13.260(2) [(1973), *repealed by* Or Laws 1979, ch 284, § 199] and proceeding to judgment under [*former*] ORS 13.380[(1973), *repealed by* Or Laws 1979, ch 284, § 199]."

One of the issues on review was whether the trial court had erred in certifying the action as a class action. The defendant argued that it had. According to the defendant, the action did not satisfy the predominance requirement of *former* ORS 13.220(2)(c) because final determination of the action would require separate adjudications of the claims of numerous class members. As the Supreme Court recognized, borrowers who knew, at the time that they obtained their loans, how the defendant would use their deposits "would be bound by their knowledge." 281 Or at 570. The defendant argued that there were many such borrowers and, therefore, it was entitled to make individual inquiries as to each

borrower's knowledge. The defendant further argued that, because it was entitled to make such individual inquiries, class certification was inappropriate.

Applying *Bernard*, the Supreme Court identified the question on review as whether the plaintiff had carried its burden of demonstrating that it "[was] not 'likely' that separate adjudications [would] be required to resolve th[e] issue [of the borrowers' knowledge] in 'numerous' instances." *Id.* The court explained that, in *Bernard*, it had held that, "[b]ased upon the evidence in that case[,] * * * the probabilities were that sufficiently numerous members of the class had knowledge of the banks' method of charging interest to justify an individual inquiry in each case and that the situation was therefore inappropriate for a class action." *Id.* But, the court further explained, the evidence in *Derenco* was different from that in *Bernard* because

> "[t]he class in the instant case is made up of homeowners, whereas *Bernard* dealt with a class of 'commercial' loan borrowers. Although the loans in that case were not all strictly commercial (in fact, the majority of them were not), nevertheless, the evidence indicated that there were a substantial number of such borrowers who, it was reasonable to assume, likely would have had knowledge of the banks' method of charging interest. We conclude from the evidence in this case that the contrary is true concerning the knowledge of members of the class about defendant's use of the deposits for its own benefit."

*Id.* at 572.

According to the court, the evidence—which included the parties' loan documents and testimony from the defendant's loan officer that very few borrowers ever inquired about the use of the deposits—indicated that "borrowers were not told of [the] defendant's use of the money" and "the instances in which the question of the use of the money even occurred to borrowers were isolated and infrequent." *Id.* at 571-72. As a result, the court concluded that "the proof here indicates that it is 'unlikely' that 'numerous' members of the class possessed such knowledge[, *viz.*, of the defendant's use of the money,] or that the subject of the beneficial interest in the funds even occurred to them," and, therefore, it was "proper that [the] proceeding continue as a class action." *Id.* at 572.

We followed *Derenco* in *Guinasso*. As in *Derenco*, the plaintiffs in *Guinasso* were consumers who had borrowed money from the defendant for single-family home purchases and had made deposits for future tax and insurance-premium payments. They brought a class action, claiming entitlement to the income that the defendant had derived from its use of the deposits. The trial court certified the action as a class action and entered judgment in favor of the class.

On appeal, the defendant assigned error to the trial court's certification of the action as a class action. As an initial matter, we noted that *former* ORS 13.220(2)(c) had been superseded by ORCP 32, but that "that rule [did] not alter any of the analysis in *Derenco*" relevant to the requirements for a class action. 89 Or App at 272. We then considered whether the record established that the predominance requirement for certification had been satisfied. The defendant asserted that it had not, because there was, in its view, "abundant evidence that a substantial percentage of borrowers were aware when they obtained their loans that [the defendant] would retain the income from its investment of the reserve payments." *Id.* at 275.

We noted that the defendant's evidence was "more elaborate" than that presented in *Derenco*. *Id.* at 277. Specifically, the defendant had submitted evidence, including survey evidence and testimony from individual borrowers, to support its claim that numerous borrowers would have known or been on notice of the fact that the defendant would use their deposits for its own purposes, as well as evidence, in the form of expert testimony, regarding the customary practices of the savings and loan industry. We readily rejected the defendant's argument that its evidence established that individual questions predominated, stating, "[w]e conclude, as did the trial court, that the number of potential class members whom [the defendant's] evidence showed may have had the requisite knowledge, discounted by the unreliability of their memories of what they knew, does not overcome the inference that unawareness predominates or the *Derenco* standards for determining whether common questions predominate." *Id.* at 277-78. We further stated that the defendant's evidence that there was an industry custom was unpersuasive and "wholly unconvincing of any likelihood that significant numbers of borrowers were aware

of the purported customary practice." *Id.* at 278. Accordingly, we affirmed the trial court's certification of the action as a class action.

Bernard, Derenco, and Guinasso establish how to determine whether a question is a common or individual one. As the cases illustrate, when determining whether a question is common or individual, a court is determining how the question should be litigated; it is not resolving the question itself. In other words, it is determining whether it is possible and appropriate for the parties to litigate the question through evidence common to the class, which depends on the likelihood that valid conclusions can be drawn about the class as a whole. That, in turn, depends on the likelihood that, at the times relevant to the disputed question, the putative class members were similarly situated or acted in a similar manner. Thus, in *Bernard*, *Derenco*, and *Guinasso*, the issue was whether it was unlikely that a substantial number of the plaintiff borrowers knew or had reason to know of the defendant lenders' practices.

Accordingly, in those cases, the courts focused on whether each defendant's claim that the borrowers knew about its lending practices had "sufficient basis and substance to justify its litigation in 'numerous' instances." *Bernard,* 275 Or at 158. In other words, they asked whether it was "reasonable to assume" that a "substantial number" of the class members actually knew about the lenders' practices. *Derenco,* 281 Or at 572. If so, then individual inquiries were justified. Thus, in *Bernard,* the court concluded that *"the probabilities [were] that sufficiently numerous members of the class had knowledge* of the banks' methods of charging interest to justify an individual inquiry in each case." *Id.* at 570 (emphasis added). In contrast, in *Derenco,* the court held that the proof in the case "indicates that *it [was] 'unlikely' that 'numerous' members of the class possessed such knowledge[, viz.,* of the defendant's use of the money]," *Id.* at 572 (emphasis added), and in *Guinasso,* we held that it was unlikely that "significant numbers of borrowers" knew of lenders' customary practices. 89 Or App at 278. Thus, under *Bernard,* *Derenco,* and *Guinasso,* whether plaintiffs in this action can prove reliance on a class-wide basis depends on

whether it is likely that significant numbers of class members did not rely on defendant's representations.[17]

*Bernard, Derenco,* and *Guinasso* also illustrate our standard of review. As explained in *Bernard,* whether a class is sufficiently cohesive presents a legal question for the trial court, which we review for legal error. We are bound by the trial court's factual findings, but—just as when we assess whether a criminal defendant's admission was voluntary—we have a duty to draw our own legal conclusion regarding the demonstrated cohesiveness of the class. 275 Or at 154.

Having identified the test for determining whether a question can be fairly litigated based on evidence common to the class and our standard of review, we apply it to determine whether, in this case, reliance is a common or individual question.

First, we note that, as a general matter, it is possible to prove reliance on a class-wide basis. Questions involving motivations, like questions involving consumers' knowledge, can vary from consumer to consumer, but, as *Derenco* and *Guinasso* demonstrate, such questions can be resolved on a class-wide basis. The Supreme Court has addressed whether reliance can be proved on a class-wide basis in two cases: *Newman,* 287 Or 47, and *Strawn v. Farmers Ins. Co.,* 350 Or 336, 258 P3d 1119, *adh'd to on recons,* 350 Or 521, 256 P3d 100 (2011), *cert den,* ___ US ___, 132 S Ct 1142 (2012).

In *Newman,* the plaintiffs sought to recover for deteriorating galvanized pipe that the defendant had used when it constructed their homes. The Supreme Court affirmed the trial court's decision that the case could proceed as a class action as to the plaintiffs' claims for implied warranty and negligence, neither of which required proof of reliance. It also affirmed the trial court's decision that the claim

---

[17] In 1994, the Council on Court Procedures amended ORCP 32 B by removing the sentence defining predominance that the Supreme Court discussed in *Bernard.* Our review of that textual change and its legislative history does not reveal any alternative method to use to determine whether an issue is susceptible to common proof or, conversely, will require individual determinations. Nor do the parties suggest any alternative method. Consequently, we adhere to the method set out and applied in *Bernard, Derenco,* and *Guinasso.*

could not proceed as a class action on the plaintiffs' express-warranty claim, which required the plaintiffs to show that they and the class members had relied on the defendant's representations. The plaintiffs argued that they could prove reliance on a class-wide basis because they could show that each class member had received a brochure containing the alleged misrepresentation. The court explained that that, alone, was not sufficient to show class-wide reliance:

> "Even if plaintiffs can prove the brochure was given to all members of the class in this case, that would not establish that every member of the class read, was aware of, and relied upon each of the representations in the brochure. The brochure made statements about many features of the townhouses, various floor plans, vaulted ceilings, color-matched kitchen appliances, brick-enclosed courtyards, etc. The water pipes and their composition is a relatively minor component."

287 Or at 54. However, the court also explained that, under different circumstances, the plaintiffs might be able to prove reliance based on evidence common to the class:

> "We do not hold that an express warranty is never an appropriate subject for a class action adjudication or that the issue of reliance always requires individual determination. However, here, the alleged express warranty is such a small part of the item purchased and the representation is interspersed with many other descriptive statements.

> "We hold that reliance upon the express warranty is not proved merely by evidence that the warranty was contained in a sales brochure given to all class members."

*Id.* Thus, while the court in *Newman* held that, under the circumstances of that case, reliance was not susceptible to class-wide proof, it expressly reserved the possibility that, in other cases, it could be.

In *Strawn*, the plaintiffs alleged that the defendant, Farmers Insurance, had represented that, under its personal injury protection (PIP) coverage, it would pay all reasonable medical and hospital expenses that policyholders incurred due to an automobile accident. The plaintiffs further alleged that they and the class members had relied on that representation and had incurred medical and hospital expenses at the usual and customary rates. However, the plaintiffs

alleged, Farmers' representation was false because Farmers did not disclose that it would pay their claims in accordance with cost-containment procedures that resulted in some claims not being paid in full and that, when it paid benefits, it misrepresented how it calculated them. As a result, the plaintiffs had incurred medical expenses for which Farmers had not reimbursed them.

The trial court certified the class, and the case proceeded to trial. Farmers moved for a directed verdict on the issue of reliance, arguing that the plaintiffs had failed to present evidence from which the jury could find that all of the class members had relied on the misrepresentations. The trial court denied the motion, and the jury found in favor of the plaintiffs.

On appeal, Farmers assigned error to the trial court's denial of its motion for a directed verdict, renewing the arguments that it had made at trial. Thus, the issue on appeal was whether the plaintiffs had to present direct evidence at trial that each class member knew of the representation, had interpreted it to mean that Farmers would pay the full billed charges, and had relied on the representation. 350 Or at 354. Farmers insisted that such evidence was necessary, while the plaintiffs argued that they needed only to prove reliance for the class as a whole and that doing so did not require direct evidence of reliance by every individual class member. They argued that evidence that Farmers made the same promise to every class member through its policies and that each plaintiff made a claim under the policy after being involved in an accident was sufficient for the jury to infer class-wide reliance on Farmers' representation. *Id.*

Both parties in *Strawn* relied on *Newman* to support their arguments. The Supreme Court rejected Farmers' argument that *Newman* had held that reliance in a class action must always be established by evidence of each class member's individual reliance. *Strawn*, 350 Or at 356. Rather, the court stated, *Newman* suggested that common rather than individualized evidence was appropriate "when the same misrepresentation was made to all individual class members and was sufficiently material or central to the plaintiff's and the defendant's dealings that the individual class members naturally would have relied on the misrepresentation." *Id.* Although *Newman* was an example

of a case that did not lend itself to common evidence of reliance, the court commented, *Strawn* presented a much more compelling case. *Id.* at 359. The misrepresentation was in a uniform provision of a contract for motor vehicle insurance, not a brochure that some purchasers might never have seen. In addition, PIP benefits are statutorily mandated and the terms of PIP coverage are extensively controlled by statute. A person who purchases a motor vehicle insurance policy in order to comply with Oregon law does not need to read the policy in order to rely on its provisions. Thus, the jury was entitled to infer that an insured's reliance on the PIP coverage that the policy provides is inherent in the purchase of the insurance. *Id.* at 361. The court summarized the general requirements for an inference of reliance to arise:

> "[T]he same misrepresentation must have been made without material variation to the members of the class. In addition, the misrepresentation must be of a nature that the class members logically would have had a common understanding of the misrepresentation, and naturally would have relied on it to the same degree and in the same way."

*Id.* at 359.

We conclude that, in this case, as in *Strawn*, plaintiffs can prove reliance through evidence common to the class as a whole. At the outset, we note that a person is able to establish causation if the person relied on defendant's representations regarding Marlboro Lights when purchasing even one package of Marlboro Lights. The fact that a person may have relied on the representations initially, but later stopped, is relevant to the amount of the person's damages, but not to liability. Thus, whether the question of causation can be litigated based on evidence common to the class depends on the likelihood that there is a substantial number of class members who never relied on defendant's representations that Marlboro Lights were "Lights" and had "Lowered Tar & Nicotine." The uniform nature of defendant's representations, defendant's design and extensive marketing of the cigarettes, and studies and surveys that indicate that many persons who smoked light cigarettes believed that they were safer than regular cigarettes convince us that defendant's representations were a substantial factor in the vast majority of the putative class members' purchases of at least one pack of Marlboro Lights.

First, the nature of the representations supports the conclusion that putative class members would have relied on them. As we have noted, the representations were universal, prominent, and unqualified. Every package of the cigarettes sold in Oregon during the class period bore the name "Marlboro Lights" and the description "Lowered Tar & Nicotine." The name and description appeared on the front of each package and were not qualified in any way. Nothing on the packages suggested that whether the cigarettes were "light" or would deliver "lowered tar and nicotine" depended on how they were smoked, as opposed to inherent properties of their contents. Nothing on the packages indicated that the representations were based on machine-measured tar and nicotine yields or that those yields were primarily attributable to small holes in the cigarettes' filters. Thus, nothing about the packages or the cigarettes themselves would have put purchasers on notice that they needed to take certain actions in order for the cigarettes to be "lowered tar and nicotine." In addition, the representations concerned the distinguishing feature of the cigarettes: They reflected the only difference that defendant identified between Marlboro Lights and Marlboro Regulars on their packages, which defendant always sold for the same price.

Moreover, Marlboro Lights were designed and marketed to appeal to persons to whom the representations would matter. As recounted above, 257 Or App at 109-16, as more information about the health risks of cigarette smoking became public, cigarette manufacturers became concerned about losing current and future customers, and they began to develop cigarettes that they could promote to customers concerned about the health risks of smoking.

And promote they did. Defendant engaged in extensive marketing, supported by sophisticated psychological and behavioral research,[18] to induce reliance by consumers on their representations that Marlboro Lights were light and would deliver less tar and nicotine. Defendant's

---

[18] *See, e.g.*, H. Wakeham, *Smoker Psychology Research* (Nov 26, 1969) (presented to Philip Morris Directors) (explaining that the Philip Morris Research Center was "highly and effectively instrumented with the most modern research tools, and the quality of our staff[, which numbered 330,] is second to none in the business").

marketing was targeted at people who were concerned about their health and, therefore, would buy light cigarettes because they thought that the light cigarettes would deliver less tar and nicotine than regular cigarettes and, consequently, would be healthier or make it easier to quit smoking. Defendant's brand-development efforts were well funded. For example, between 1976 and 1978, defendant spent $20 million dollars in two years advertising Marlboro Lights. Monograph 13, at 216 tbl.

In addition, defendant's representations about the tar and nicotine yields of Marlboro Lights were made in an environment that encouraged smokers to focus on those yields of cigarettes. In a 1981 report, the Surgeon General stated, "Overall, our judgment is unchanged from that of 1966 and 1979: smokers who are unwilling or as yet unable to quit are well advised to switch to cigarettes yielding less 'tar' and nicotine * * *." US Department of Health & Human Services, Public Health Service, Office on Smoking & Health, *The Health Consequences of Smoking: The Changing Cigarette*, v (Jan 1981).

Defendant's marketing efforts were successful. As defendant's internal documents report, many consumers believed that lower-tar cigarettes would help protect them from the adverse health consequences of smoking and acted on that belief. For example, a 1976 study commissioned by defendant stated:

> "More people have switched brands in the past year, and the largest group of switchers have gone to low tars.
>
> "Even among those who have not switched to a low tar brand, there is a fairly high disposition among smokers to consider switching to one. This is probably attributable to the continuing concern over smoking and health, and this study shows that *the smoking public is convinced that to the extent any brands are better for health, it is the low tar brands that are.*"

The Roper Organization, Inc., *A Study of Smokers' Habits and Attitudes with Special Emphasis on Low Tar Cigarettes*, 3 (May 1976) (emphasis added) (prepared for Philip Morris, USA). Similarly, in 1978, a Philip Morris research scientist explained, "It is likely, for example, that the popular belief

that low-tar cigarettes are 'healthier' than full-flavor cigarettes means that people who are concerned about their health will be more likely to switch to low-tar products." F. J. Ryan, *Exit-Brand Cigarettes: A Study of Ex-Smokers*, Philip Morris Research Center Special Report, 3 (Mar 1978).

Ultimately, whether plaintiffs and the other putative class members relied on defendant's representations is a question for the jury. At the class-certification stage, plaintiffs needed to demonstrate only that the class is sufficiently cohesive. They did so. They established that it is unlikely that there are numerous putative class members who did not actually rely on the representations; the representations were "sufficiently material or central to * * * plaintiff[s'] and * * * defendant's dealings that the individual class members naturally would have relied on the misrepresentation." *Strawn*, 350 Or at 356.

In support of its argument that it is likely that numerous putative class members did not actually rely on its representations, defendant points to survey evidence, newspaper and magazine articles, and the individual plaintiffs' own smoking histories. *See* 257 Or App at 124-26. But defendant puts more weight on that evidence than it can bear.

There are two problems with the surveys. First, the surveys do not necessarily capture the information relevant to causation in this case. For example, one survey asked respondents for the "main reason" they smoked lower-yield cigarettes and therefore would not reflect other reasons that may well have been substantial factors in the respondents' cigarette choice. *See* 257 Or App at 125.

Second, and more importantly, the survey respondents' answers are extremely likely to have been affected by cigarette marketing. They may parrot back advertising claims, especially those that allow the respondents to explain their smoking decisions without admitting addiction or recognizing health risks. Cigarette manufacturers, although aware that many smokers were concerned about the risks of smoking and wanted to protect against them, knew that smokers did not want to be reminded of the risks and adjusted their advertisements to accommodate that desire.

Monograph 13, at 5 ("Because cigarette manufacturers persistently maintained that cigarette smoking did not cause any disease, they could not advertise a product as safer since it would be necessary to acknowledge the risks of their existing products."). Accordingly, after establishing the popular belief that low-tar cigarettes are healthier, manufacturers shifted from explicit verbal assertions of health toward implied healthfulness and notions of "taste."

Not surprisingly, then, survey respondents claim to choose cigarettes based on taste, a fact that defendant emphasizes. But, as one cigarette manufacturer's 1975 internal report stated, "[I]t is almost impossible to know if the taste smokers talk about is something which they, themselves attribute to a cigarette or just a 'play-back' of some advertising messages." Monograph 13, at 209 (quoting Market and Research Counselors, Inc., *What Have We Learned From People? A conceptual summarization of 18 focus group interviews on the subject of smoking*, 2 (prepared by Brown & Williamson) (May 26, 1975) (alteration in Monograph 13)). Indeed, defendant's own research shows that smokers are remarkably insensitive to taste nuances in cigarettes, H. Wakeham, *Smoker Psychology Research*, 7 (Nov 29, 1969), and that "most smokers do not smoke for 'taste'[, but] rather [for] the habitual cluster of sensations they have become used to," including the dose of nicotine, *The Cigarette Consumer* (Mar 1984).

Defendant also argues that it is likely that numerous members of the class did not rely on defendant's representations because of articles in the lay press. Defendant cites articles describing the FTC Method and explaining that smokers could receive more tar and nicotine than measured by the FTC Method if they smoked cigarettes differently than the machine smoked them, including by covering up the holes on dilution filters, as well as articles explaining that smokers who switch from a higher- to a lower-yield cigarette might change their method of smoking in order to get more nicotine. *See* 257 Or App at 125-26.

However, at the same time that those articles were being published, defendant was countering them by asserting that smoking was not harmful, that nicotine was not addictive, and that the FTC Method was highly accurate,

thereby implying that its representations based on the FTC Method were meaningful. For example, following a 1982 study that was the subject of some of the newspaper and magazine articles on which defendant relies, *see* Neil L. Benowttz *et al.*, *Smokers of Low-Yield Cigarettes Do Not Consume Less Nicotine*, 309 New Eng J Med 139 (1983), a Philip Morris representative stated that "the industry believes that there is insufficient evidence to implicate cigarette smoking as a cause of lung cancer and heart disease," John Wilke, *Study Advises Smokers to Quit, Not Just Switch*, Wash Post, July 21, 1983, at A1 (discussing statements by a Tobacco Institute spokesman responding to the study). In 1994, in a full-page advertisement published in the *New York Times, Wall Street Journal*, and *Washington Post*, defendant denied that cigarettes are addictive and, at the same time, vouched for the accuracy of the FTC tests. That defendant's misinformation campaign was successful is evident from the fact that many of the articles that defendant cites, which were published over the course of more than 20 years, repeat the same basic information about compensation and note the same widespread public misconception that light cigarettes deliver lower tar and nicotine. *See* 257 Or App at 125-26 (summarizing articles cited by defendants published between 1967 and 1994).

Finally, defendant argues that the testimony of the representative plaintiffs, Pearson and Grandin, supports its position on class certification because they continued smoking Marlboro Lights after they had learned that they were not inherently light. But both plaintiffs testified that they began smoking Marlboro Lights because they believed that Marlboro Lights would reduce the health risks from smoking. The fact that Pearson continued to smoke Marlboro Lights after learning that they are not inherently light and can deliver the same or more tar and nicotine than Marlboro Regulars does not retroactively change her initial reliance on defendant's representation, nor does it deprive her of a claim for purchases based on that reliance[19]—nor does the fact that Grandin was aware that her fingers covered the dilution holes in the filters of Marlboro Lights.

---

[19] As plaintiffs concede, Pearson would not be entitled to damages for purchases made after she learned that Marlboro Lights are not inherently light.

### 3. *Predominance*

As noted above, the trial court concluded that both causation and ascertainable loss were individual issues and further concluded that, even if just one of those questions were an individual question, common questions still would not predominate, given the centrality of each question to the action. We review the trial court's conclusion regarding predominance for legal error. *Bernard*, 275 Or at 154 (a reviewing court is "not bound by the trial court's conclusion regarding predominance of common questions because whether the facts justify such a conclusion is a matter of law"). Contrary to the trial court, we have concluded that the misrepresentation, ascertainable loss, and causation elements of plaintiffs' claim are all common issues. Thus, the entire liability portion of the claim can be litigated through common evidence. Because those common issues are vastly more significant to the litigation than the remaining individual issues, common issues predominate.

Two of defendant's arguments against the predominance of common issues merit discussion. First, defendant argues that determining class membership will require individual inquiries. It contends that, because consumers are unlikely to maintain receipts from their purchases of cigarettes, "claims of class membership would often be made based on little more than self-serving assertions by class members themselves." Second, it asserts that its statute-of-limitation defense will require individual inquiries because the applicable statute of limitation begins to run "within one year from the discovery of the unlawful method, act or practice." ORS 646.638(6). As a result, defendant argues, the determination whether the statute of limitation expired before this claim was filed will require "examining what each class member knew or should have known at particular points in time."

We agree with defendant that both of those questions will require individual inquiries of class members; nevertheless, for two reasons, that does not affect our conclusion that common issues predominate. First, as many federal courts have recognized under FRCP 23(B)(3), individual issues concerning parts of a claim other than liability—

for example, damages and statutes of limitation—do not defeat certification where "a sufficient constellation of common issues binds class members together." *Waste Management Holdings, Inc. v. Mowbray*, 208 F3d 288, 296 (1st Cir 2000); *see also, e.g., In re Monumental Life Ins. Co.*, 365 F3d 408, 421 (5th Cir 2004) ("Though individual class members whose claims are shown to fall outside the relevant statute of limitations are barred from recovery, this does not establish that individual issues predominate, particularly in the face of defendants' common scheme of fraudulent concealment."); *In re Visa Check/Mastermoney Antitrust Litigation*, 280 F3d 124, 139 (2d Cir 2001) ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damages issues."); American Law Institute, *Principles of the Law of Aggregate Litigation* § 2.02 (purpose of the predominance requirement is to determine whether class treatment "will materially advance the resolution of multiple civil claims"). Here, the common issues will be dispositive as to defendant's liability. Plaintiffs will present evidence that defendant engaged in an unlawful trade practice with respect to all of the putative class members and that all of the putative class members suffered ascertainable losses as a result of that unlawful trade practice. Any individual questions that arise will do so only after a jury has determined the central question of defendant's liability to the class.

Second, and more importantly, in determining the amount of each class member's damages, a fact finder will also be in a position to efficiently answer the individual questions that defendant raises. If a jury concludes that defendant is liable, each class member will be entitled to damages for each pack of Marlboro Lights that he or she bought in reliance on defendant's representations. In order to calculate that number, a fact finder must ascertain the number of packs that each class member purchased before he or she learned that Marlboro Lights are not inherently light. That determination will also shed light on both of the individual inquiries that defendant raises: In the determination of how many packs of Marlboro Lights each person bought, the question whether that person bought *any* packs—and, consequently, whether he or she is a member

of the class—will also be answered. And the determination of when each class member's reliance ended—that is, when each class member understood that Marlboro Lights were not inherently light—will determine the facts relevant to defendant's statute-of-limitation defense.

4.  *Superiority*

The trial court considered the superiority factors listed in ORCP 32 B(1) to (8). As to each factor except predominance of common issues, the court concluded that a class action was superior to other methods for resolving the controversy. Overall, however, its ruling that common issues did not predominate caused it to conclude that "a class action, either for the entire case or for any specific issues[,] would not be superior to individual actions for adjudication of the controversy. In my view the scales are tipped by the fact that not only do the individual issues predominate over the common ones, they do so overwhelmingly."

We review a trial court's superiority determination for abuse of discretion. *Newman*, 287 Or at 51; *Joachim*, 48 Or App at 393. When a discretionary decision involves weighing factors that, in turn, depend on legal conclusions, we review the underlying legal conclusions for legal error. *Shumake v. Foshee*, 197 Or App 255, 261, 105 P3d 919 (2005). When a trial court makes a discretionary determination based on a legal error, we remand for a new exercise of the trial court's discretion "unless, on the facts of a particular case, our ruling means that there is only one legally permissible decision." *Id.* at 261-62.

Here, as explained above, the trial court erred in concluding that individual issues predominated. Thus, the single factor that the court found to weigh against the superiority of class treatment actually weighs in favor of class treatment. Nevertheless, we conclude that a remand is necessary because, on the facts of this case, the court could conclude that certifying the entire case as a class action—which, as discussed above, would involve individual determinations of damages and the statute of limitation—is less manageable than certification of an issue class as to the liability-related issues. *See* ORCP 32 B(7). We are not in a position to

evaluate, in the first instance, the issues of judicial administration and manageability implicated by the superiority determination. *See Newman*, 287 Or at 51 ("In reviewing the trial court's determination that a proceeding shall or shall not be conducted as a class action, it must be remembered that this is largely a decision of judicial administration; that is, how the trial shall proceed. In making such decisions the trial court is customarily granted wide latitude.").[20]

## C.   *Certification of an Issue Class*

In their third assignment of error, plaintiffs challenge the trial court's denial of their request for certification of an issue class. As an alternative to certification of all of the issues in the case, plaintiffs moved for "certification of the class as it relates to all specific common issues." They noted that "[a]ll common issues identified by plaintiffs in this motion are appropriate for class certification."

Plaintiffs explained that "[t]he trial court may treat common issues together in a single class proceeding and leave individual questions for later determination." "When an issue class is certified, the prerequisites set forth in ORCP 32 A and the superiority analysis required by ORCP 32 B measure the proposed class against the common issues certified. Thus, even if the court concludes that common issues do not predominate as to the class as a whole, an issue class may be certified as to common issues." (Citations omitted.)

---

[20] Plaintiffs argue that the trial court erred in "reject[ing] [their] class claims for equitable relief." Plaintiffs' argument is based on the trial court's conclusion that plaintiffs would have to "prove that[,] for a given period of time during which a certain number of packs were purchased, the smoker of those cigarettes was on average receiving as much tar and nicotine from them as he or she would have received from the same number of Marlboro Regulars." Plaintiffs argue that, "[i]f the trial court's conclusion in [that] regard is correct, there is no plain, speedy, adequate remedy for individual smokers and equitable relief is appropriate for the damages suffered at purchase when consumers (prior to smoking) purchased a product that was not as represented." (Emphasis in original.) Therefore, plaintiffs further argue, the trial court should have provided for equitable relief. Because we conclude that the trial court's conclusion is not correct, we need not address plaintiffs' argument that the trial court was required to certify a class for equitable relief.

Plaintiffs' argument in favor of an issue class reduced to a contention that, if the court agreed with defendant that some issues were individual, it could nevertheless certify an issue class that encompassed all of the common issues. Specifically, plaintiffs argued, if the court did not certify any common issues,

> "every plaintiff will [have to] prove the history of light cigarettes, the design characteristics of the product, the defendant's internal documents that indicate knowledge of the true nature of the product, the marketing decisions about the product, the product placement, advertising and promotion, consumers' responses to 'Lights' and 'Lowered Tar & Nicotine,' defendant's recurring common defenses, and on and on."

In other words, plaintiffs contended that defendant had acted the same way with respect to each class member, and, consequently, that at least the false representation and ascertainable loss portions of plaintiffs' claims were worthy of issue-class certification. Plaintiffs also argued that, if the trial court certified an issue class as to all of the elements of liability, putative class members should be able to obtain statutory damages.

In its letter opinion, the trial court noted, in a footnote, that, "[i]n the motion for class certification, plaintiffs do not specify what the 'issues classes' might be," and that "[p]laintiffs list 17 issues of fact arising out of their own factual statement and 39 issues of law arising out of defendant's affirmative defenses, all of which they assert are 'common.'" In the text of its opinion, however, the court evaluated plaintiffs' request for certification of an issue class despite the lack of specificity that it had identified in the footnote:

> "ORCP 32 G permits the court to order that an action be maintained as a class action with respect to particular claims or issues. Each subclass must separately satisfy the requirements of ORCP 32, except for subsection A(1). As an alternative to their motion to have the entire controversy certified as a class action, plaintiffs ask the court to certify 'the class as it relates to all specific common issues.' * * * [This] alternative proposal[] [does] not eliminate the main obstacle to certification of the whole case as a class action: the overwhelming predominance of individual issues.

"This is not a typical case where liability can be bifurcated from damages. (The need for individual proof of damages is no obstacle to class certification in any event.) The most fundamental issue of the case, no matter how it is sliced, is whether defendant's representation that a pack of Marlboro Lights would deliver lower tar and nicotine than Marlboro Regulars was false. The answer to the question is, in the words of Dr. Benowitz, 'it depends.' The individual questions would predominate."

Thus, in the trial court's view, each of the three elements of plaintiffs' UTPA claim—an unlawful trade practice, causation, and damages—had some component that could be resolved only through individual evidence: Defendant's statement that lights had lowered tar and nicotine was a false representation only as to those smokers who did not actually receive lowered tar and nicotine, so the question of an unlawful trade practice had an individual element. Whether each class member had suffered an ascertainable loss depended, in the court's view, on whether he or she had actually received the same amount of tar and nicotine from lights as he or she would have from regulars. And the court concluded that the question of reliance would require individual determinations.

Because, in the court's view, each of the elements of plaintiffs' claim contained individual questions, there were no substantial common issues left to certify in an issue class. As the court explained, individual issues predominated in every element of plaintiffs' claim. On appeal, plaintiffs assign error to the court's denial of the motion to certify an issue class, arguing that the court erred in ruling that individual issues predominated.

In contrast to the trial court, which concluded that each element of plaintiffs' claim—a false representation, reliance, and ascertainable loss—implicated questions that could be answered only through individual evidence, we conclude that all three elements may be proved through common evidence. In light of that conclusion, the trial court's analysis of plaintiffs' request for certification of an issue class—and its consequent discretionary denial of that request—were premised on a legal error. Accordingly, if, on remand, the trial court concludes that certification of the entire class is not superior to other methods of adjudicating

the controversy, it must revisit its exercise of discretion as to plaintiffs' motion for certification of an issue class.

## III. SUMMARY

In sum, as to plaintiffs' first assignment of error, we conclude that the trial court erred in granting defendant's motion for summary judgment on the ground that plaintiffs' claims are preempted by federal law.

As to plaintiffs' second assignment of error, we conclude that (1) to prove damages—*viz.*, that they and the putative class members have suffered ascertainable losses— plaintiffs would have to prove that the Marlboro Lights that they and the putative class members purchased were not inherently light and that the missing feature had value; (2) whether plaintiffs and the putative class members have suffered ascertainable losses can be litigated on a class-wide basis; (3) to prove causation—*viz.*, that they and the putative class members have suffered ascertainable losses "as a result of" defendant's representations—plaintiffs would have to prove that they and the putative class members relied on the representations; (4) whether plaintiffs and the putative class members relied on the representations can be litigated on a class-wide basis; (5) because all of the elements of liability can be proved on a common basis, the trial court erred in concluding that common questions would not predominate over individual questions; (6) the trial court's conclusion that a single class action would not be superior to other available methods for adjudicating the controversy was premised on a legal error; and, therefore, (7) we must remand in order for the trial court to reconsider whether a class action is superior to other methods of litigating the controversy.

As to plaintiffs' third assignment of error, the trial court's denial of plaintiffs' request for certification of an issue class was based on its conclusion that all three elements of plaintiffs' claims required individual inquiries. Because that conclusion was erroneous, if the trial court determines that an issue class covering questions of liability would be superior to treatment of the entire case as a class action, it must reconsider plaintiffs' motion for certification of an issue class.

Reversed and remanded.

**DUNCAN, J.,** concurring in part and dissenting in part.

As the majority describes, to prove their Unlawful Trade Practices Act claim, plaintiffs have to prove three elements: an unlawful trade practice, causation, and damages. 257 Or App at 117. The majority holds that each of those elements can be litigated on a class-wide basis. I respectfully disagree. In my view, the element of causation cannot be litigated on a class-wide basis.

As the majority holds, to prove the causation element of their particular claim—*viz.*, that they and the putative class members suffered ascertainable losses "as a result of" the alleged unlawful trade practice, ORS 646.638(1)—plaintiffs have to prove that they, and each putative class member, relied on defendant's representations about Marlboro Lights. 257 Or App at 146. For the reasons explained below, I do not believe that the issue of reliance can be litigated on a class-wide basis. Therefore, I dissent from the majority's holdings that (1) plaintiffs could litigate reliance on a class-wide basis, 257 Or App at 161-66; (2) the trial court erred in concluding that common issues predominated, 257 Or App at 166-68; and (3) remand is necessary for the trial court to reconsider whether to certify the action as a class action, 257 Or App at 169. However, because I agree with the majority's holdings that plaintiffs could litigate the other two elements of their claim—*viz.*, whether defendant engaged in an unlawful trade practice and whether plaintiffs and the putative class members suffered ascertainable losses—on a class-wide basis, 257 Or App at 138-39, I concur in the majority's holding that the case must be remanded to the trial court to reconsider its decision regarding the certification of an issue class because that decision was predicated on the erroneous conclusion that none of the three elements of plaintiffs' claims could be litigated on a class-wide basis, 257 Or App at 172.

Under the Oregon Supreme Court's case law, whether an issue can be litigated on a class-wide basis depends on the cohesiveness of the class. *Bernard v. First Nat'l. Bank*, 275 Or 145, 159-60, 550 P2d 1203 (1976); *Derenco v. Benj. Franklin Fed. Sav. and Loan*, 281 Or 533, 570, 577 P2d 477,

*cert den,* 439 US 1051 (1978). That is, it depends on the likelihood that the class members share the characteristic necessary for the issue to be resolved in their favor. If it is likely that numerous members of the class do not share that characteristic, then the issue cannot be litigated on a class-wide basis; it is an individual issue. Thus, in *Bernard* and *Derenco,* where the plaintiff-borrowers' claims depended on whether they and the class members *lacked knowledge or notice* of the defendant-banks' lending practices, the Supreme Court focused on whether it was likely that numerous members of the classes *did not lack knowledge or notice* of the practices.

Accordingly, in this case, where plaintiffs' claim depends on whether they and the putative class members *relied* on defendant's alleged representation that Marlboro Lights were inherently light, we must focus on whether it is likely that numerous members of the class *did not rely* on that representation. More precisely, because the party seeking class certification bears the burden of proving that the requirements for class certification have been met with respect to the elements of its claim, we must ask whether plaintiffs established "that the number of [class members] who would be legitimately subject to challenge on the issue of [reliance] is less than 'numerous.'" *Bernard,* 275 Or at 162 (quoting *former* ORS 13.220(2)(c) (1973), *repealed by* Or Laws 1979, ch 284, § 199); *see also Bernard,* 275 Or at 159 (focusing on the likelihood that a "considerable number" of the class members lacked the required characteristic); *Derenco,* 281 Or at 572 (focusing on whether a "substantial number" of the class members lacked the required characteristic).

Under certain circumstances, class members' reliance on a defendant's representation can be litigated on a class-wide basis. As the Supreme Court held in *Strawn v. Farmers Ins. Co.,* 350 Or 336, 358, 258 P3d 1199, *adh'd to on recons,* 351 Or 521, 256 P3d 100 (2011), *cert den,* ___ US ___, 132 S Ct 1142 (2012), "[d]irect evidence of reliance by each of the individual class members is not always necessary[.]" Reliance on the part of all class members "can, in an appropriate case, be inferred from circumstantial evidence." *Id.* For that inference to arise in a case like this one, "the same misrepresentation must have been made without

material variation" and "the misrepresentation must be of a nature that the class members logically would have had a common understanding of the misrepresentation, and naturally would have relied on it to the same degree and in the same way." *Id.* at 358-59. Thus, in this case—where there is no dispute that defendant made the same representations to all of the putative class members—the questions, for class certification purposes, relate to the likelihood that the putative class members had a common understanding of the representations and, if they did, the likelihood that the representations played a substantial role in their decisions to purchase Marlboro Lights.[1]

The representations at issue were that Marlboro Lights were "Lights" and had "Lowered Tar and Nicotine." In my view, reliance on the part of all putative class members cannot be inferred from circumstantial evidence in this case because of the likely variations in both how putative class members understood defendant's representations and, relatedly, whether the representations played a substantial role in their decisions to purchase Marlboro Lights.

Some putative class members may have understood the representations to mean that Marlboro Lights were inherently light; that is, they may have understood the representations to mean that Marlboro Lights would deliver less tar and nicotine than Marlboro Regulars, regardless of how the Marlboro Lights were smoked. Such putative class members may have believed that either the contents or the design of the cigarettes made it impossible for Marlboro Lights to deliver the same amount of tar and nicotine as Marlboro Regulars. But other putative class members may have understood the representations to mean only that Marlboro Lights would deliver less tar and nicotine if smoked the same way as Marlboro Regulars. In other words, they may have understood that, in a side-by-side comparison, with all other variables controlled, Marlboro Lights would deliver less tar and nicotine than Marlboro regulars, a fact which plaintiffs do not dispute.

---

[1] It bears emphasizing that, at the certification stage, the questions relate to whether to the likelihood that the putative class contains a "considerable number," *Bernard*, 275 Or at 159, or a "substantial number," *Derenco*, 281 Or at 572, of members who did not rely on the representations, which is distinct from a determination of the merits of plaintiffs' claim.

It may well be that, given defendant's representations and its advertising, many putative class members who purchased Marlboro Lights early in the class period did not know or have reason to know that Marlboro Lights were not inherently light. But the class period is long: It runs from 1971 to 2001. In that 30-year period, information about dilution filters and the phenomena of titration and compensation was increasingly available.

As defendant points out, there were articles in the lay press throughout the class period that explained that light cigarettes could deliver the same amount of tar and nicotine as regular cigarettes. As described in the majority's opinion, as early as 1976, within five years of the 1971 introduction of Marlboro Lights, *Consumer Reports* published an article explaining compensation, stating that "[n]icotine is an addicting agent for most smokers. When cigarette smoke contains less nicotine than such smokers are accustomed to, their bodies simply contrive ways to get more smoke[,]" and that human smokers "do not necessarily smoke a low-nicotine cigarette in the same way they smoke a high-nicotine cigarette[.]" 257 Or App at 125. Such warnings continued to be published in the national and local press, including in a 1983 *Newsweek* article which stated that "[t]he widely touted notion that low-tar-and-nicotine cigarettes are safer than stronger brands is a pipe dream," and in a 1994 *Oregonian* article, which described the FTC Method and stated that "[s]mokers of cigarettes labeled low in tar and nicotine may be getting more of those substances than they think."[2] 257 Or App at 126.

Thus, information about the fact that Marlboro Lights are not inherently light was in the press for many years of the class period. Given the availability of that information, it is possible that a considerable number of the putative class members knew, or at least were on notice, that Marlboro Lights were not inherently light.

---

[2] In addition, in 1990, defendant began to include information about titration in its advertising (although not on its Marlboro Lights packages). The advertisements stated, "The amount of tar and nicotine you inhale will vary depending on how you smoke the cigarette." Admittedly, that statement does not explain that the amount of tar and nicotine that a smoker can receive from a Marlboro Light can be the same as the smoker could receive from a Marlboro Regular, but it does provide notice that tar and nicotine yields can be affected by smoking methods.

Indeed, some of the survey evidence in the record suggests that a considerable number of people, including smokers of light and ultra-light cigarettes, did not believe that light and ultra-light cigarettes were safer than regular cigarettes. As described in the majority's opinion, in one survey, 51 percent of the smokers surveyed agreed that smoking low-tar cigarettes was safer than smoking high-tar cigarettes and, in another survey, 35 percent of light and ultra-light smokers said that they chose their brand for health-related reasons. 257 Or App at 125. Those numbers suggest that, although many people may have believed that light cigarettes were safer than regulars, many other people did not. And even those who believed that light and ultra-light cigarettes were safer could have understood that they were not inherently safer.

Thus, this case is like *Bernard*, where the Supreme Court concluded that the information it had regarding the nature of the loans and the characteristics of the class members gave rise to a legitimate question about whether a "considerable number" of the class members knew about the defendants' lending practices. 275 Or at 159, 162. Here, there is a legitimate question about whether a considerable number of the putative class members knew, or were on notice, that Marlboro Lights were not inherently light and, therefore, did not understand defendant's representations to mean that Marlboro Lights were inherently light or did not rely on the representations

Given that, I would conclude that the trial court did not err in ruling that the element of causation could not be litigated based on evidence common to the class. I would further conclude that the trial court did not err in ruling that, because the element of causation would have to be litigated based on evidence specific to each class member, common questions did not predominate and, consequently, a class action would not be superior to other methods for adjudicating the controversy.

Regarding predominance, I would conclude that, in light of the importance to the action of putative class members' reliance, the trial court did not err in ruling that common questions did not predominate. In determining

whether common issues predominate, a court must consider the relative importance of common and individual questions to the action, not their numbers. *Cf. Moore v. PaineWebber Inc.*, 306 F3d 1247, 1252 (2d Cir 2002) (under FRCP 23(b)(3), common issues predominate if the issues that can be resolved through generalized proof "are more substantial than the issues subject only to individualized proof"). Here, because the question of causation is an individual question and resolution of it could involve questioning thousands of class members, common issues do not predominate. *See Newman v. Tualatin Development Co.*, 287 Or 47, 53-54, 597 P2d 800 (1979) (no predominance where "individual determinations of reliance would be required"); *Bernard*, 275 Or at 162 (no predominance where substantial issue of class members' knowledge of banks' practices could not be litigated through common evidence).

Regarding superiority, I would affirm the trial court's ruling, which we review for abuse of discretion. *Newman*, 287 Or at 51; *Joachim v. Crater Lake Lodge*, 48 Or App 379, 393, 617 P2d 632, *rev den*, 290 Or 211 (1980). The trial court assessed the manageability of a class action trial, which would involve individual inquiries of thousands of class members. Considerations relevant to that assessment include the difficulties of maintaining a jury for such a trial and the possibility that the risks of a mistrial would increase with the duration of the trial and number of witnesses. The trial court could reasonably decide to avoid the possibility that, perhaps after the presentation of a few hundred class-member witnesses, something would trigger a mistrial, with the result that the case would have to be tried again and all of those witnesses would have to be recalled. Thus, although individual trials would be repetitive, the trial court could conclude that they would be more manageable, more likely to reach a conclusion and, therefore, superior to a single class action.

Accordingly, I would affirm the trial court's decision denying certification of the action as a class action. However, because, as mentioned, I agree with the majority's determination that the trial court's decision denying certification of an issue class was based on the erroneous conclusion that none of the three elements of plaintiffs' claims could be

litigated on a class-wide basis, I concur in the majority's conclusion that reversal and remand is required for the trial court to reconsider that decision.

Haselton, C. J., and Schuman and Hadlock, JJ., join in this dissent.